956 A.2d 926

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Noel Matos MONTALVO, Appellant.**

Supreme Court of Pennsylvania.

Argued May 12, 2008.

Decided Sept. 24, 2008.

Gerald Anthony Lord, Esq., Miller, Poole & Lord, L.L.P., Philadelphia, for Noel Matos Montalvo.

Christopher D. Carusone, Esq., Amy Zapp, Esq., PA Office of Attorney General, Hugh S. Rebert, Esq., York County District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Justice BAER.

This is a direct appeal from the imposition of a sentence of death by the Court of Common Pleas of York County. Following a trial by jury in 2003, Noel Matos Montalvo (Appellant) was found guilty of one count of first-degree murder and

one count of second-degree murder arising out of the killing of two victims, Miriam Ascencio (Miriam) and Nelson Lugo (Nelson), on April 19, 1998. Appellant also appeals from lesser sentences imposed for his convictions of burglary and criminal conspiracy, which arose from the same criminal episode as the murders. Because we find no merit to the issues raised by Appellant, we affirm the judgments of sentence.

To provide context for our analysis, we begin with a brief discussion of Appellant's brother, Milton Montalvo (Brother), and his late wife, Miriam. The record reveals that, sometime in 1995, Brother and Miriam moved from Puerto Rico to York County, Pennsylvania. By all accounts, the couple's marriage during this time was fraught with frequent fighting and disagreements. Although unclear, the record suggests that, by March of 1998, the disagreements between the couple had worsened, prompting Brother to move out of the apartment he had shared with Miriam. As detailed in the following paragraph, Brother's separation from Miriam did little to quell the turbulence of their relationship, as they remained in contact with each other and continued to argue over the following month.

On April 18, 1998, Brother stopped by a local grocery store operated by an acquaintance of his, Ms. Ester Soto (Ms. Soto). During his visit, Brother used the store's telephone to call Miriam about certain unemployment checks that she had allegedly received in the mail. N.T., 3/14/2003, at 616–17. The conversation between Brother and Miriam soon grew acrimonious, and Brother began shouting angrily at Miriam over the telephone. As this was occurring, Appellant entered the grocery store and walked to Brother's location. When Brother hung up the telephone a few minutes later, Ms. Soto overheard Brother tell Appellant that he wanted to kill Miriam. Appellant then told Brother to "leave it to him," and that he would murder Miriam himself. *Id.* at 619.

That evening, Miriam and her friend, Nelson, were dancing at "Swizzles," a local bar in York. The record indicates that at some point later in the evening, Miriam and Nelson left the bar and walked to Miriam's apartment a few blocks away.

Some time after 11:30 p.m., one of Miriam's neighbors, Vincent Rice, awoke when he heard glass breaking on the common porch he shared with Miriam. Mr. Rice then heard Brother exclaim, "Open the door!" Shortly thereafter, banging sounds were heard emanating from the apartment.

The following day, Mr. Rice called the police after he peered into Miriam's apartment and observed an unknown male lying on the floor inside. N.T., 3/13/2003, at 574. Upon their arrival, the responding officers observed that the door to Miriam's apartment had a window in the center of it divided into four panes, and that the pane nearest to the door lock was broken. N.T., 3/13/2003, at 574-75, 583. After further investigation, the police discovered the lifeless bodies of Miriam and Nelson lying on the floor inside. A subsequent autopsy report revealed that Miriam died from stab wounds to her eyes, blunt force trauma to her head and body, and lacerations across her neck. Nelson's autopsy report revealed that he died from a stab wound to his chest.

Shortly after the murders occurred, Appellant and Brother drove to Ms. Soto's home and met with her husband, Miguel Soto (Miguel). During this visit, Ms. Soto, who was in a nearby bedroom, overheard Appellant and Brother describing in gruesome detail how they murdered Miriam and Nelson earlier that night. The record indicates that police eventually learned about Appellant's and Brother's meeting with Miguel when they interviewed Ms. Soto during a subsequent police investigation. During this interview, Ms. Soto told the investigating officers that she specifically recalled hearing Appellant admit that he killed Miriam by cutting her throat and stabbing her in the eyes.

A day or two after the murders, Appellant and Brother fled Pennsylvania and drove to Florida. Brother was captured in 1999 and extradited to York County to stand trial for the murders of Miriam and Nelson. In due course, Brother was convicted of two counts of first-degree murder and one count of burglary, and, after a penalty hearing, was sentenced to

death.[1] In contrast, Appellant remained a fugitive for several more years. In February 2002, however, agents from the Federal Bureau of Investigation (F.B.I.) received a tip that Appellant had moved from Florida to an apartment unit located in Hudson County, New Jersey. This tip proved accurate, as Appellant, who had changed his appearance and was living under an assumed name, was found at this location shortly thereafter. Appellant was extradited to York County to face charges in this case for homicide, conspiracy to commit homicide, and burglary.

During a jury trial in March 2003, the Commonwealth presented the testimony of Miriam's niece, Patricia Ascencio, who explained that she saw Appellant and Brother together at approximately 9:30 or 10:00 p.m. the night of the murders. N.T., 3/13/2003, at 482–83. Another witness, Nici Negron, testified that around 12:30 a.m., he observed Appellant and Brother sitting together in a Dodge van in an alleyway. N.T., 3/13/2003, at 505–06. Finally, the Commonwealth presented the testimony of Miriam's neighbors, Mr. Rice and Mr. Fidelio Morell. Mr. Rice recounted the sounds he had heard on the night of the murders, noting that he heard glass breaking, that he heard Brother's voice, and that there were banging sounds that sounded like someone "wrestling." N.T., 3/13/2003, at 545–46. Mr. Morell, who lived below Miriam's apartment, testified that he also heard Brother's voice on the night of the murders, that he heard Miriam say, "call the police," and that "dragging" sounds were coming from Miriam's apartment shortly thereafter. N.T., 3/13/2003, at 603.

Ms. Soto also testified for the Commonwealth, recounting the conversation she overheard at her grocery store between Appellant and Brother the evening before the murders. In

1. During the preliminary hearing in Brother's case, Ms. Soto testified that, when Appellant and Brother came to her house following the murders, she heard Brother, rather than Appellant, admit to the murders. Then, during the actual trial of Brother, Ms. Soto testified that she could not recall any statements made by Appellant or Brother regarding the homicides. As detailed *infra* at note 6, the defense uses Ms. Soto's prior inconsistent testimony in Brother's case as a basis for impeaching Ms. Soto's credibility in the instant case.

this regard, Ms. Soto testified that she overheard Brother state that he wanted to kill Miriam, and that Appellant responded by stating that he would personally kill Miriam. Ms. Soto also reiterated the statements she had made to police after the murders, in which she indicated that she specifically overheard Appellant admit that he killed Miriam by cutting her throat and stabbing her in the eyes with his knife. Finally, Ms. Soto testified that, when Appellant and Brother stopped by her house after the murders to visit Miguel, they were driving a Dodge van. N.T., 3/14/2003, at 623.

In addition to Ms. Soto's testimony, the Commonwealth introduced additional evidence in its case-in-chief to demonstrate Appellant's consciousness of guilt. First, the Commonwealth called various witnesses who corroborated evidence that Appellant and Brother fled Pennsylvania immediately after the murders and drove to Florida. Second, the Commonwealth introduced the testimony of an F.B.I. agent, who stated that Appellant had changed his appearance and was living under a different name while on the run. *See* N.T., 3/14/2003, at 706–09.

■ In its final instructions to the jury before it retired to deliberate, the court explained that, with respect to the charge of first-degree murder, Appellant was charged with taking the life of Miriam, either as a principal or as an accomplice. N.T., 3/19/2003, at 26.[2] The court then instructed that, with respect to the charge of conspiracy to commit homicide, Appellant could be found guilty if it was proven beyond a reasonable doubt that Appellant: 1) agreed with Brother that one of them would commit a homicide; 2) that Appellant had the intent to promote or facilitate the homicide, and 3) that the homicide was committed by *Brother* in furtherance of the common plan.[3]

2. Criminal liability for first-degree murder can be imposed where the jury finds that a defendant, with the requisite specific intent to kill, committed the crime either as a principal or as an accomplice. *See Commonwealth v. Rios,* 546 Pa. 271, 684 A.2d 1025, 1032 n. 10 (1996) (noting that the defendant in that case could be convicted of first-degree murder either as a principal or as an accomplice).

3. As fully detailed later in this opinion, Appellant claims that, because the jury instructions indicated that he could only be found guilty of

. On March 19, 2003, Appellant was found guilty of one count of first-degree murder, (the murder of Miriam), one count of second-degree murder, (the murder of Nelson), conspiracy to commit homicide, and burglary. At the penalty phase, the Commonwealth argued two aggravating circumstances with respect to Appellant's first-degree murder conviction: 1) the killing was committed during the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)); and 2) Appellant had been convicted of another murder committed either before, or at the time of, the offenses at issue (42 Pa.C.S. § 9711(d)(11)). The defense, in contrast, argued two mitigating circumstances: 1) Appellant had no significant history of prior criminal convictions (42 Pa.C.S. § 9711(e)(1)); and 2) there were other mitigating factors under the catch-all mitigator, including the fact that he was a good worker, attended church, and was a good son to his mother (42 Pa.C.S. § 9711(e)(8)). At the conclusion of the penalty phase, the judge directed defense counsel to present his closing argument first, before the Commonwealth's closing argument.[4]

At the conclusion of the sentencing hearing on April 14, 2003, the jury found proven by the requisite burdens of proof all the aggravating and mitigating circumstances argued during the penalty phase of trial, and concluded that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court imposed the death penalty for the first-degree murder of Miriam, and a sentence of life imprisonment for the second-degree murder of Nelson. Appellant also received 10 to 20 years of imprisonment for burglary, which was imposed concurrent to a 10 to 20 year sentence of imprisonment for conspiracy to commit homicide.

conspiracy if *Brother* committed the murders, and given that Appellant was, in fact, convicted of conspiracy, then the jury must have found him guilty as an accomplice, concluding that Brother was the principal.

4. At the conclusion of the penalty phase, Appellant's attorney stated in his closing argument, "Ladies and gentlemen, the fate of my client's life is in your hands and I ask you to examine your hearts and conscious [sic] and weigh the mitigating factors that the judge instructs you and be guided accordingly. That's all I have." N.T., 3/19/03, at 87.

No post-sentence motions were filed by Appellant's counsel following the trial. Subsequently, Appellant filed a timely notice of appeal and complied with the trial court's Pa.R.A.P. 1925 order, directing him to file a concise statement of matters complained of on appeal. In his 1925(b) statement, Appellant raised 48 issues, all of which were rejected as unmeritorious by the trial court in a subsequent opinion and order. Pursuant to the automatic direct appeal provisions provided in 42 Pa.C.S. § 722(4) and § 9711(h)(1), the case is now before this Court for review.

## I. Sufficiency of the Evidence

As a preliminary matter, we note that Appellant has failed to brief all but four of the original 48 issues he raised in his Pa.R.A.P.1925(b) statement, thereby waiving these claims. *See Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 585 n. 5 (1998) (noting that an issue is waived when an appellant fails to develop it properly in his brief). Among the issues Appellant has preserved is a claim challenging the sufficiency of the evidence as to all four of his convictions.[5] We will therefore begin our discussion with Appellant's sufficiency challenge to his first-degree murder conviction, wherein he claims that there was no direct evidence indicating that he was responsible for killing Miriam, or that he had the specific intent to kill.[6]

---

5. Moreover, we note that our Court has an independent obligation in all capital cases to review the sufficiency of the evidence supporting a first-degree murder conviction. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

6. In addition to arguing that there was no direct evidence linking Appellant to the homicides, Appellant spends several pages in his brief arguing that the evidence was "insufficient" because the Commonwealth's witness, Ms. Soto, was not credible. In this regard, Appellant emphasizes that Ms. Soto gave conflicting testimony at Brother's trial several years earlier. This specific claim, however, challenges the weight, and not the sufficiency, of the evidence. *See Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 107 (2004) (noting that questions concerning inconsistent testimony go to the credibility of the witness, and hence, implicate the weight, rather than sufficiency of the evidence). While we acknowledge that Appellant included a boilerplate weight of the evidence claim in his 1925(b) statement, he has since abandoned this claim on appeal to us. We further note that the jury found Ms. Soto's testimony credible, which was within its prerogative.

Further, we will concurrently address Appellant's claim that there was insufficient evidence of an agreement to sustain his conviction for conspiracy to commit homicide.

In reviewing the sufficiency of the evidence, we examine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as verdict winner, support the jury's finding of all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Overby*, 575 Pa. 227, 836 A.2d 20, 22 (2003). In applying this standard, we bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence. *Commonwealth v. Diggs*, 949 A.2d 873, 877 (Pa.2008).

To convict a defendant of first-degree murder, the jury must find that (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill. *See* 18 Pa.C.S. § 2502(a); *Spotz*, 759 A.2d at 1283. Specific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1009 (2007). Further, to prove conspiracy, "the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another ... to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1238 (2004). Finally, each member of a conspiracy to commit homicide can be convicted of first-degree murder

*See id.* (noting that this Court cannot substitute its judgment for that of the jury on issues of credibility). Finally, as summarized in our analysis of Appellant's sufficiency claims, there was evidence presented at trial implicating Appellant in the homicides, such that the verdict cannot be said to shock one's sense of justice. *See Commonwealth v. Diggs*, 597 Pa. 28, 38–39, 949 A.2d 873, 879 (2008) (stating that, in a claim that the verdict is against the weight of the evidence, a new trial will be awarded only if the jury's verdict is so contrary to the evidence as to shock one's sense of justice).

regardless of who inflicted the fatal wound. *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456, 460 (1998).

With these standards in mind, we are satisfied that the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to sustain Appellant's convictions for first-degree murder in the killing of Miriam, and for conspiracy to commit such offense. With respect to first-degree murder, we observe that Appellant does not dispute that Miriam's death was a homicide, as the evidence plainly established that she died from stab wounds to her eyes and from lacerations across her neck. Instead, Appellant only challenges the second and third elements of first-degree murder—*i.e.*, whether he was responsible for Miriam's death, and whether he had a specific intent to kill.

The evidence presented at trial revealed that, at her grocery store on the evening before the murders, Ms. Soto overheard Appellant and Brother discuss killing Miriam. During this conversation, Appellant told Brother to "leave it to him," and that he would kill Miriam himself. While no one testified that they saw or heard Appellant at the crime scene, several witnesses testified that they saw Appellant and Brother together both before and after the murders, raising an inference that they were together when Miriam was murdered. In addition, Ms. Soto testified that when Appellant and Brother stopped by her house following the murders, she specifically heard Appellant admit that he killed Miriam by stabbing her in the eyes and cutting her throat with his knife, which, as noted, is the manner in which Miriam was, in fact, killed. Further, Appellant then fled Pennsylvania and was found in New Jersey several years later living under an assumed name, evidencing his consciousness of guilt. *See Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 598 (2007) (noting that flight and concealment can be circumstantial proof of consciousness of guilt). Based on these facts, a jury could have found beyond a reasonable doubt that Appellant was responsible for Miriam's death.

■ In evaluating whether Appellant acted with the specific intent to kill, we note that Miriam died from stab wounds to her eyes and neck. As we indicated earlier, the use of a deadly weapon on a vital part of a body can provide circumstantial evidence of a criminal defendant's intent. *See Rega,* 933 A.2d at 1009 (noting that the use of a deadly weapon on a vital part of a body is evidence of specific intent to kill). Accordingly, as the record indicates that Appellant used a knife on Miriam's neck—a vital part of her body—we conclude that there was also sufficient evidence adduced at trial for a jury to find that Appellant acted with the specific intent to kill Miriam. *See Commonwealth v. Blakeney,* 946 A.2d 645, 652 (Pa.2008) (noting that the neck is a vital part of a victim's body).

■ We are likewise satisfied that these facts support Appellant's conviction for conspiracy to commit homicide. Given our conclusion that Appellant acted with a specific intent to kill when he committed first-degree murder, we further conclude that Appellant acted with the requisite *mens rea* to establish the first element of conspiracy: that he intended to commit, or to aid in the commission of, a criminal act. *See Murphy, supra* at 8 (setting forth the elements of conspiracy). Further, as recounted earlier, Appellant and Brother were heard discussing killing Miriam the evening before the murders, and both were seen together before and after the crimes, thereby supporting the existence of a conspiratorial agreement. Finally, as the object of the conspiratorial agreement was ultimately satisfied with the death of Miriam, we likewise conclude that a jury could have found that an overt act was committed in furtherance of the crime.[7]

■ In addition to first-degree murder and conspiracy, Appellant also challenges the sufficiency of the evidence supporting his convictions for second-degree murder and burgla-

---

7. As noted earlier, the trial court instructed the jury that Appellant could be found guilty of conspiracy if *Brother* committed the murders. *See supra* at 5. We do not speak to whether these instructions were proper, but merely conclude that there was sufficient evidence supporting Appellant's conspiracy conviction.

ry. According to Appellant, his second-degree murder conviction cannot be sustained because there was no direct evidence that he committed a burglary by unlawfully entering Miriam's apartment on the night Nelson was killed. In his view, the evidence established that Brother, rather than Appellant, was the actual perpetrator of the crimes. The Commonwealth counters that there was substantial evidence indicating that both Appellant and Brother unlawfully entered Miriam's apartment with the intent to commit a homicide therein, and that Nelson was killed as these crimes were being committed.

■ "A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." *Commonwealth v. Small*, 559 Pa. 423, 741 A.2d 666, 681 n. 19 (1999); 18 Pa.C.S. § 2502(b). The term "perpetration of a felony" is defined as "the act of . . . engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit . . . burglary. . . ." 18 Pa.C.S. § 2502(d). Finally, a person commits burglary if he "enters a building or occupied structure . . . with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter." 18 Pa.C.S. § 3502.

Appellant asserts that Brother broke into Miriam's apartment and killed Nelson, and that Brother was acting alone when he engaged in these crimes. Contrary to his position, however, there was circumstantial evidence presented at trial connecting Appellant to the crime scene. As summarized in our discussion of first-degree murder, when Appellant and Brother were in Ms. Soto's grocery store prior to the murders, Appellant was heard stating that he would kill Miriam himself in response to Brother's statement that he wanted to kill Miriam. According to Ms. Soto, shortly after the murders, she overheard Appellant tell her husband that he killed Miriam by cutting her throat and stabbing her in the eyes, which, in fact, was how Miriam was killed. In addition, various witnesses saw Appellant and Brother together before and after the murders, raising the inference that Appellant

was with Brother when the crimes occurred. Based on these facts, a jury could have found beyond a reasonable doubt that Appellant and Brother acted together by unlawfully entering the apartment with the intent to kill Miriam, and that Nelson was stabbed to death during the course of the burglary.

## II. Ineffective Assistance of Counsel

We now turn to Appellant's argument alleging that his trial counsel was ineffective for failing to prepare adequately for the guilt and penalty phases of trial. However, before addressing the merits of this claim, we observe that, in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), *reargument denied*, 573 Pa. 141, 821 A.2d 1246 (2003), our Court announced a new general rule providing that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." In so holding, we explained that we were abrogating the prior rule requiring new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel was appointed, explicitly overruling *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977), which established that practice.

In this case, Appellant acknowledges our holding in *Grant*, but requests that it not be applied here. While we note that, in *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), this Court established a narrow exception to the rule in *Grant*, where a trial court has conducted an evidentiary hearing on the ineffectiveness claim and resolved it on the merits, Appellant does not argue that this case falls under that exception. Instead, Appellant baldly states that this Court should recognize a new exception to *Grant* where trial counsel's ineffectiveness is "apparent from the record." Appellant's Brief at 48. We decline his invitation, however, as we disagree with Appellant that the full scope of his trial counsel's ineffectiveness can readily be assessed from the record without further evidentiary development by the trial court. Accordingly, we hold that this claim must be deferred to post-conviction proceedings under the rule established in *Grant*.

## III. Aggravating Circumstances

 In his third claim, Appellant argues that the jury should not have been permitted to consider the aggravating circumstance that the murder was committed in perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6) (henceforth, "the (d)(6) aggravator"). According to Appellant, in *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657, 662 (1998), our Court established a rule that the (d)(6) aggravator "may not be applied to an accomplice who does not 'commit' the killing in the sense of bringing it to completion or finishing it." In Appellant's view, the jury never found him to be the actual killer of Miriam because, as noted, during the judge's final instructions to the jury before deliberation, the judge explained that Appellant could be found guilty as a conspirator if, *inter alia,* it found that the crime was committed by *Brother. See supra* at 5. Appellant claims that, because he was ultimately convicted of conspiracy, the jury must have found, in accordance with these instructions, that *Brother* was the actual killer of Miriam, making Appellant guilty only as an accomplice. As a result, Appellant concludes that the (d)(6) aggravator was inapplicable.

The Commonwealth responds that Appellant failed to object at trial to the submission of the (d)(6) aggravator to the jury. Because no objection was made before the jury retired to deliberate, the Commonwealth asserts that this claim is waived pursuant to Pa.R.Crim.P. 647(B), which states: "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate. . . ." In the alternative, the Commonwealth argues that, based upon the substantial evidence adduced at trial suggesting that Appellant personally killed Miriam by stabbing her eyes and cutting her throat, then the jury found Appellant guilty as a principal, and not as an accomplice, thus rendering the rule in *Lassiter* inapplicable.

As noted above, Pa.R.Crim.P. 647(B) states that, to preserve a challenge to a jury instruction, the defendant must make a specific objection to such instruction before the jury

retires to deliberate. Upon reviewing the transcript of the sentencing hearing included in the certified record, we note that the Commonwealth discussed the applicability of the (d)(6) aggravator at least twice during the penalty phase. *See* N.T., 3/19/03 at 51, 88. We also note that Appellant's counsel was aware that the Commonwealth was arguing for the applicability of the (d)(6) aggravator, as he mentions the (d)(6) aggravator in passing during the sentencing hearing. N.T., 3/19/03 at 55–56. However, at no point during these proceedings did Appellant's counsel actually raise an objection to the submission of the (d)(6) aggravator to the jury. Accordingly, we agree that Appellant has waived this claim pursuant to Pa.R.Crim.P. 647(B).[8]

## IV. Order of Closing Statements at Sentencing

■ In his final issue, Appellant argues that, at the conclusion of the penalty phase, the trial court erroneously directed defense counsel to present his closing statement before the Commonwealth's closing statement. Appellant notes that Pa. R.Crim.P. 806 plainly states that, in death penalty cases, the defendant's closing statement at a sentencing hearing is to be made last.[9] According to Appellant, by directing defense counsel to present his closing statement before the Commonwealth's closing statement, he was deprived of the opportunity to have the "last word with the jury." Appellant's Brief at 75.

In response, the Commonwealth concedes that it was, in fact, error for the trial court to direct Appellant's counsel to present his closing statement first rather than last. *See* Appellee's Brief at 15 (referring to the court's "error" in

8. We decline to address the Commonwealth's alternative claim that, in any case, this claim lacks merit, because, even though we hold herein that Appellant's counsel did not preserve this issue because he failed to lodge an objection at trial, Appellant is free to raise this issue in the context of an ineffective assistance of counsel claim on PCRA review. Thus, our review of the merits of this waived claim at this juncture would not be appropriate.

9. Pa.R.Crim.P. 806 provides in full: "After the presentation of evidence at the sentencing hearing, each party shall be entitled to present one closing argument for or against the sentence of death. The defendant's argument shall be made last."

directing defense counsel to present his closing argument before the Commonwealth's closing argument). Nevertheless, the Commonwealth asserts that this claim is waived because Appellant's counsel failed to object at trial. In the alternative, the Commonwealth argues that any error on the part of the trial court is nevertheless harmless when one considers that Appellant's closing statement was a mere two sentences in length. *See supra* note 4.

■■■ Similar to our discussion of Appellant's third issue, we note the general rule that, in order to preserve a claim on appeal, a party must lodge a timely objection at trial. *See Commonwealth v. May,* 584 Pa. 640, 887 A.2d 750, 758 (2005) ("To the extent the claims would sound in trial court error, they are waived due to the absence of contemporaneous objections."); *Commonwealth v. Dougherty,* 580 Pa. 183, 860 A.2d 31, 37 (2004) (noting that failure to object results in appellate waiver); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Upon careful review of the trial transcript, we observe that, immediately after the trial judge directed Appellant's counsel to go first in presenting his closing statement, Appellant's counsel merely complied with the trial court's instruction. N.T., 3/19/03, at 87. Shortly thereafter, the Commonwealth presented its closing statement. *Id.* At no point, however, does the record reveal that Appellant's counsel lodged an objection to the order in which the closing arguments were presented. Accordingly, we hold herein that, like his third issue, Appellant has also waived this final claim.[10]

## Review of Death Sentence

Having concluded that Appellant is not entitled to relief on any of the claims he raises on appeal, we must affirm the

10. We decline to address the Commonwealth's alternative claim that this error was harmless, because, even though we conclude that Appellant's counsel did not preserve this issue because he failed to lodge an objection, Appellant is free to raise this issue in the context of an ineffective assistance of counsel claim on PCRA review. Accordingly, our review of the merits of this waived claim would not be appropriate at this juncture.

sentence of death unless it was a product of passion, prejudice, or any other arbitrary factor, or if the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3)(i)-(ii).[11] After careful review of the record, we conclude that the sentence of death imposed by the trial court was not a product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence admitted at trial. We likewise conclude that the evidence supports the jury's finding of at least one aggravating circumstance: that Appellant had been convicted of another murder committed either before or at the time of the offenses at issue. *See* 42 Pa.C.S. § 9711(d)(11), *supra* at 5. In addition, Appellant's sentence for first-degree murder complies with 42 Pa. C.S. § 9711(c)(1)(iv), which requires a sentence of death when the fact-finder finds one or more aggravating circumstances that outweigh any applicable mitigating circumstances.

Accordingly, Appellant's judgment of sentence is affirmed.[12]

Chief Justice CASTILLE, and Justice SAYLOR and EAKIN, Justice TODD and Justice MCCAFFERY join the opinion.

11. 42 Pa.C.S. § 9711(h)(3) provides in relevant part:
 The Supreme Court shall affirm the sentence of death unless it determines that:
 (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or
 (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)....

12. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).