J-A13038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL DARRELL HATFIELD | : | |
| | : | |
| Appellant | : | No. 2359 EDA 2021 |

Appeal from the Judgment of Sentence Entered October 19, 2021
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0002427-2020

BEFORE: OLSON, J., DUBOW, J., and KING, J.

MEMORANDUM BY KING, J.:           **FILED OCTOBER 3, 2022**

Appellant, Michael Darrell Hatfield appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas, following his jury trial convictions for first degree murder and possession of an instrument of crime ("PIC").[1] We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> On April 10, 2020 at about 11:00 a.m., Officer Matthew Maciejewski of the Pottstown Borough Police Department was dispatched to 331 North Hanover Street, Apartment 89, for a report of an assault victim. He knew from dispatch that there was a domestic incident and that the male caller to 911 said he had hurt his wife. Officer Maciejewski, along with another Pottstown Borough Police Officer, Officer Sovari, knocked on the apartment door. When Appellant

---

[1] 18 Pa.C.S.A. §§ 2502(a), and 907(a), respectively.

answered, Officer Maciejewski asked him "[i]s your wife here? Is she okay?" Appellant told the officers that he strangled her, and permitted them inside. Officer Maciejewski walked over to what looked like a person on the living room floor, while Appellant walked to the adjacent kitchen with Officer Sovari.

Officer Maciejewski determined that it was a female on the floor, and that the victim had no pulse. He observed that that there was dried blood coming from her ears and a large pool of blood under her mouth. He overheard Appellant tell Officer Sovari that he had strangled his wife two days prior using an orange electrical cord. Officer Maciejewski was able to locate the orange electrical cord in the bottom of a trash can.

Next on-scene was Officer Michael Damiano of the Pottstown Borough Police Department. While both Officer Maciejewski and Officer Damiano cleared the crime scene, Appellant spontaneously stated twice to Officer Sovari that he just snapped. This was overheard by Officer Maciejewski. After about 15 to 20 minutes of the police arriving, Appellant was taken into custody.

Lieutenant Todd Richard of the Montgomery County Detective Bureau, Homicide Unit, participated in the investigation as the lead detective, and took Appellant's voluntary statement at the Pottstown Police Department[, which reads in relevant part as follows:]

[QUESTION:] Did you call 9-1-1 today?

ANSWER: Yes.

[QUESTION:] Why[?]

ANSWER: I needed a police officer at the residence. I hurt my wife.

[QUESTION:] What did you do to her?

ANSWER: Strangulation.

[QUESTION:] What did you use to strangle her?

- 2 -

ANSWER: An electrical cord, a standard electrical cord.

[QUESTION:] When did you strangle her?

ANSWER: Wednesday night, [i]t was after dark. I remember we were watching Channel 69 Weather, but that's a continuous show. It runs all the time, so I can't give you the exact time.

[QUESTION:] What happened that led to you to strangling her?

ANSWER: I snapped and lost it. It started out we were going over her medicines, like everything that she is taking and what we could get rid of. Next thing I knew, she called me an asshole and some other choice words. I spoke her name, Mary, and told her to calm down. She got verbally abusive towards me. I don't recall the exact words she was using. I could just describe it was verbally abusive. I went around the table, opened the door to the closet and grabbed the electrical cord. I wrapped the cord around her neck and strangled her.

[QUESTION:] Where were you in the house when this occurred?

ANSWER: We were in the living room. Mary was sitting in her recliner chair. Mary has several medical problems, heart patient. She had a bypass several years ago. She uses a breather because she has COPD, knee replacements, high blood pressure.

[QUESTION:] Did you say anything to Mary prior to strangling her?

ANSWER: Nothing other than telling her to calm down.

[QUESTION:] Did Mary see you get the extension cord?

ANSWER: - -

[QUESTION:] Excuse me, electrical cord?

ANSWER: No, [s]he was facing away from the closet where I got it.

[QUESTION:] Did you say anything while you were strangling her?

ANSWER: No.

[QUESTION:] How long did you strangle her before she died?

ANSWER: A short period of time. I couldn't give you a time.

[QUESTION:] How did you know she had died?

ANSWER: She went limp.

[QUESTION:] Did she try to fight you at all?

ANSWER: She moved her arms like downward, but she didn't really put up a fight.

[QUESTION:] Had you been drinking or using drugs when this occurred?

ANSWER: No.

[QUESTION: What] did you do after she was dead?

ANSWER: I laid a blanket on the rug. I also removed a plastic cover from the bed and put the bed back together and laid the plastic on top of the blanket, and then I laid Mary on the plastic.

[QUESTION: Why] did you do that?

ANSWER: I just did.

[QUESTION:] Did you think about trying to move her out of the apartment?

ANSWER: I couldn't move her. I just didn't know what to do.

[QUESTION:] Did you call anyone after this happened?

ANSWER: No. I talked to my youngest daughter Wednesday after this happened. I didn't tell her what happened though.

[QUESTION:] What is your daughter's name?

ANSWER: Lisa Hatfield or Jordan, which is one of her married names. She lives up in Reading.

[QUESTION:] What made you call the police today?

ANSWER: I had to get help for Mary and for myself. I mean, I just didn't know what to do.

[QUESTION:] Where is the electrical cord that you used to strangle Mary?

ANSWER: In the trash can in the living room sitting next to the recliner. Also there is a sheet in there. That sheet had been on her recliner. I didn't use it for anything. I just threw it away.

[QUESTION:] Did you leave Mary lying on the living room floor from the time you killed her to the time you called the police?

ANSWER: Yes. I never move her once. I put her on the floor.

[QUESTION:] Can you describe to me how you strangled Mary?

ANSWER: I went around the table. I knew that there was an extension cord in the closet because I used it before. After I grabbed it, I walked behind her. She was seated in her recliner. I wrapped it around her neck and pulled with both hands until she stopped moving.

[QUESTION:] Did you know what you were doing was wrong?

ANSWER:  Yes, I did.

\*     \*     \*

[QUESTION:] Is everything you told me in this statement the truth?

ANSWER:  Yes.

[N.T. Trial, 10/19/21, at 48-49, 50-56].

(Trial Court Opinion, filed 1/4/22, at 2-7) (some internal citations and quotation marks omitted).

Prior to trial, Appellant filed a motion requesting individual *voir dire*. Appellant also filed a motion *in limine* to preclude the testimony of Mary Hatfield's granddaughter, Charlotte Butterfield.  Specifically, Appellant aimed to preclude anticipated testimony from Ms. Butterfield that days before Ms. Hatfield's death, Appellant uncharacteristically told Ms. Butterfield and her cousins that he loved them and asked if they would abandon him if anything happened to their grandmother.  The trial court heard argument on both issues on October 8, 2021.  The court denied Appellant's request for individual *voir dire*.  Regarding the motion *in limine* to preclude Ms. Butterfield's testimony, the court did not issue an express ruling and stated, "All right. Thank you.  All right.  Next."  (N.T. Pre-trial Motions Hearing, 10/8/21, at 14).

Jury selection commenced on October 18, 2021.  The court explained the nature of the charges to the jury panel, including the allegations of domestic violence and inquired whether such charges would prevent any prospective jurors from being fair and impartial.  Four prospective jurors

indicated that they could not be impartial, and they were stricken for cause. The court additionally inquired whether any prospective jurors had prior experiences with domestic violence such that it would prevent them from being fair and impartial, and there was no response.

Trial commenced immediately after the jury was selected. Ms. Butterfield testified that on April 8, 2020, she and her cousins went to their grandmother's house to work on the garden and Appellant was present. Ms. Butterfield stated that Appellant repeatedly told her and her cousins that he loved them, which stood out to her because he never said that to them. Appellant also inquired whether the family would be there for him and would walk away from him if anything happened to their grandmother, and Ms. Butterfield reassured him. Appellant did not object when the Commonwealth called Ms. Butterfield to testify or at any point during her testimony.

The jury found Appellant guilty of first-degree murder and PIC on October 19, 2021. The court proceeded immediately to sentencing and imposed life imprisonment. Appellant timely filed a post-sentence motion on October 29, 2021, and the court denied the motion on November 3, 2021. Appellant filed a timely notice of appeal on November 12, 2021. On November 16, 2021, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement, and Appellant complied on December 10, 2021.

Appellant raises the following issues for our review:

> Whether the trial court abused its discretion by denying Appellant's request that the individual *voir dire* method be

used where domestic violence was at issue?

Whether the trial court abused its discretion by denying Appellant's motion *in limine* to exclude testimony that had minimal probative value and was outweighed by its prejudicial impact because it did not come to light until such a later date?

Whether there was sufficient evidence presented at trial to sustain the guilty verdict for the first-degree murder charge where Appellant acted maliciously but without specific intent to kill the elderly victim who was in ill-health?

(Appellant's Brief at 7-8).

In his first issue, Appellant contends that individual *voir dire* was necessary to ensure that the jury was fair and impartial. Appellant notes that this case involved domestic abuse which is a very sensitive topic. Appellant argues that "it is extremely unlikely that not one juror in the venire was a victim of domestic violence or a perpetrator thereof, and it is equally unlikely that any would admit such information in front of a room of complete strangers." (**Id.** at 34). Further, Appellant asserts that several prospective jurors indicated that they could not be fair and impartial based on the nature of the charges and the court should have switched to individual *voir dire* at this juncture to examine whether the jurors harbored any disqualifying prejudices. Appellant concludes the court abused its discretion in denying his request for individual *voir dire* and we must grant a new trial. We disagree.

Appellate review of the jury selection process implicates the following principles:

The process of selecting a jury is committed to the sound

discretion of the trial judge and will be reversed only where the record indicates an abuse of discretion, and the appellant carries the burden of showing that the jury was not impartial.

***Commonwealth v. Noel***, 629 Pa. 100, 121, 104 A.3d 1156, 1169 (2014). "[I]t is only when the court permits the jury selection process to impugn the fundamental qualities of competence, fairness and impartiality that we may conclude that a palpable abuse of discretion has been committed." ***Id.*** at 123, 104 A.3d at 1171 (internal citation and quotation marks omitted).

"The purpose of *voir dire* is to ensure the empaneling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court." ***Id.*** at 120, 104 A.3d at 1168. "[*Voir dire*] is not intended to provide appellant with a better basis upon which to utilize his peremptory challenges. The inquiry should be strictly confined to disclosing qualifications or lack of qualifications and should focus on whether a juror has formed a fixed opinion as to an accused's guilt or innocence." ***Commonwealth v. Hathaway***, 500 A.2d 443, 447 (Pa.Super. 1985).

The Pennsylvania Rules of Criminal Procedure govern the examination of prospective jurors as follows:

**Rule 631.  Examination and Challenges of Trial Jurors**

\* \* \*

(F) In capital cases, the individual *voir dire* method must be used, unless the defendant waives that alternative. In non-capital cases, the trial judge shall select one of the following alternative methods of *voir dire*, which shall apply to the selection of both jurors and alternates:

*(1) Individual Voir Dire and Challenge System*

> (a) *Voir dire* of prospective jurors shall be conducted individually and may be conducted beyond the hearing and presence of other jurors.

> *    *    *

*(2) List System of Challenges*

> (a) A list of prospective jurors shall be prepared. The list shall contain a sufficient number of prospective jurors to total at least 12, plus the number of alternates to be selected, plus the total number of peremptory challenges (including alternates).

> (b) Prospective jurors may be examined collectively or individually regarding their qualifications. If the jurors are examined individually, the examination may be conducted beyond the hearing and presence of other jurors.

Pa.R.Crim.P. 631(F). Accordingly, individual *voir dire* is only required in capital cases. In all non-capital cases, the trial court has discretion to determine who will ask questions of the jurors and whether the jurors will be questioned individually or collectively. **See Hathaway, supra** at 144-45.

Instantly, the trial court denied Appellant's request for individual *voir dire*, noting the extra time required for individual *voir dire* and the particular need for judicial efficiency because of the backlog of criminal cases due to the COVID-19 pandemic. The court also expressed its confidence that a fair and impartial jury could be selected without individual *voir dire*. During the jury selection process, the court informed the jury panel that the case involved

- 10 -

allegations of domestic abuse and murder charges. The court also inquired whether the nature of the charges or prior experiences with domestic abuse would render any panel member unable to be fair and impartial. Any panel member who indicated as such was stricken for cause. Appellant's assertion that the jury panel would feel uncomfortable disclosing any prejudice due to prior experiences with domestic abuse is belied by the fact that four prospective jurors indicated that they could not be impartial after hearing the nature of the charges.

Appellant relies on **Commonwealth v. Glaspy**, 532 Pa. 572, 616 A.2d 1359 (1922), for the position that the court was required to switch to individual *voir dire* after prospective jurors indicated that they could not be fair and impartial. However, **Glaspy** is distinguishable from the instant matter in that **Glaspy** is based on a specific line of cases which require individual *voir dire* when the court is faced with a racially sensitive issue. As there is no indication of racial prejudice in this matter, **Glaspy** is not directly applicable. Here, there is no evidence that any of the selected jurors were not impartial or decided the case based on improper motivations. **See Noel, supra**. On this record, we cannot say that the court abused its discretion by denying individual *voir dire* on the basis of judicial efficiency. **See id.**

In his second issue, Appellant argues that the court erred by denying his motion *in limine* to preclude Ms. Butterfield's testimony. Appellant contends that Appellant's statements to Ms. Butterfield are irrelevant because

"it is not clear exactly how [Appellant] saying he loved his family, who he was not related to by blood, and that he feared they would abandon him if his connection to them were severed would make it more probable that he planned on murdering Mary Hatfield." (Appellant's Brief at 41). Appellant further avers that even if the statements were relevant, they came to light at a time so removed from the date of the murder that the probative value was outweighed by a danger of unfair prejudice. Specifically, Appellant emphasizes that Ms. Butterfield did not come forward with this information until over a year after her grandmother died, so the testimony lacked reliability and any probative value it might have provided as to premeditation was outweighed by the risk of unfair prejudice. Appellant concludes the trial court erroneously allowed testimony that was unfairly prejudicial, and this Court must grant a new trial. We disagree.

Preliminarily, Rule 103 of the Pennsylvania Rules of Evidence provides in relevant part:

**Rule 103.  Rulings on Evidence**

**(a) Preserving a Claim of Error.**  A party may claim error in a ruling to admit or exclude evidence only:

(1) if the ruling admits evidence, a party, on the record:

    (A) makes a timely objection, motion to strike, or motion in *limine*; and

    (B) states the specific ground, unless it was apparent from the context; or

*    *    *

- 12 -

**(b) Not Needing to Renew an Objection or Offer of Proof.** Once the court **rules definitively on the record**—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

Pa.R.E. 103(a), (b) (emphasis added).

Instantly, Appellant moved to preclude Ms. Butterfield's testimony by means of a motion in *limine* prior to trial. Significantly, at the hearing on the motion, the court heard argument on the issue but did not make a ruling. When Ms. Butterfield was called to testify at trial, Appellant failed to renew his objection. Appellant contends on appeal that he was not required to renew his objection to preserve the issue for appeal because the court did not explicitly state that it was holding the issue under advisement. Nevertheless, Rule 103 plainly states that a party is not required to renew an objection only if the court makes a definitive ruling on the record. **See** Pa.R.E. 103(b). As the trial court did not make a definitive ruling on the record regarding Ms. Butterfield's testimony, Appellant was required to renew his objection when Ms. Butterfield was called to testify to preserve his claim for appeal. Accordingly, Appellant has waived this issue. **See Commonwealth v. McGriff**, 160 A.3d 863, 866 (Pa.Super. 2017) (stating: "Consistent with [Rule 103], a motion *in limine* may preserve an objection for appeal without any need to renew the objection at trial, but only if the trial court clearly and definitively rules on the motion") (internal citation omitted).

Even if the issue was properly preserved, Appellant's argument lacks

- 13 -

merit. Appellant was on trial for first degree murder which requires evidence of premeditation. *See* 18 Pa.C.S.A. §§ 2502(a) (defining murder of first degree as criminal homicide committed by intentional killing); 2502(d) (defining "intentional killing" as killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premediated killing). Ms. Butterfield's testimony that Appellant inquired about how the family would treat him if something happened to Ms. Hatfield in the days immediately preceding Ms. Hatfield's death was clearly relevant to establish premeditation. *See Commonwealth v. Danzey*, 210 A.3d 333, 342 (Pa.Super. 2019), *appeal denied*, 656 Pa. 9, 219 A.3d 597 (2019) (stating: "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or tends to support a reasonable inference or proposition regarding a material fact"). Although Ms. Butterfield did not disclose this information until a year after the murder, the Commonwealth explained that there was a stall in the investigation and family interviews due to the COVID-19 pandemic. Under these circumstances, the delay in Ms. Butterfield's disclosure did not render her testimony so unreliable that the probative value was outweighed by the risk of unfair prejudice. Thus, even if Appellant had preserved his second issue, it would merit no relief.

In his third issue on appeal, Appellant argues the Commonwealth failed to meet its burden to establish that Appellant strangled Ms. Hatfield with the specific intent to kill her. Appellant claims that evidence of strangulation,

without more, is insufficient to support an inference of the specific intent to kill required for a first-degree murder conviction. Additionally, Appellant asserts that the evidence "only points to the fact that [Appellant] was overcome with such strong emotions during an argument with Mary Hatfield that he 'snapped' and, without consciously forming the intent to kill, displayed an unjustified and extreme indifference to the value of her life." (Appellant's Brief at 51). Appellant concludes the evidence was only sufficient to establish third degree murder, and this Court should reverse his conviction for first degree murder. We disagree.

When examining a challenge to the sufficiency of evidence:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Hansley***, 24 A.3d 410, 416 (Pa.Super. 2011), *appeal*

*denied*, 613 Pa. 642, 32 A.3d 1275 (2011) (quoting **Commonwealth v. Jones**, 874 A.2d 108, 120-21 (Pa.Super. 2005)). Nevertheless, "courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." **Commonwealth v. Karkaria**, 533 Pa. 412, 419, 625 A.2d 1167, 1170 (1993) (internal citation omitted) (explaining that evidence which is so unreliable and contradictory that it is incapable of supporting verdict of guilty is insufficient as matter of law).

The Crimes Code defines first-degree murder as follows:

> **§ 2502. Murder**
>
> **(a)  Murder of the first degree.**—A criminal homicide constitutes murder under the first degree when it is committed by an intentional killing.

18 Pa.C.S.A. § 2502(a).

> To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that he…unlawfully killed a human being and did so in an intentional, deliberate and premeditated manner.
>
> > It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. …
>
> The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence.

**Commonwealth v. Schoff**, 911 A.2d 147, 159-60 (Pa.Super. 2006) (internal citations omitted).

- 16 -

"[T]he period of reflection required for premeditation to establish the specific intent to kill 'may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death.'" ***Commonwealth v. Rivera***, 603 Pa. 340, 355, 983 A.2d 1211, 1220 (2009), *cert. denied*, 560 U.S. 909, 130 S.Ct. 3282, 176 L.Ed.2d 1191 (2010) (quoting ***Commonwealth v. Drumheller***, 570 Pa. 117, 146, 808 A.2d 893, 910 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003)).

"Specific intent to kill can be established though circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." ***Commonwealth v. Montalvo***, 598 Pa. 263, 274, 956 A.2d 926, 932 (2008), *cert denied*, 556 U.S. 1186, 129 S.Ct. 1989, 173 L.Ed.2d 1091 (2009). A deadly weapon is defined as a "device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S.A. § 2301. "A deadly weapon need not be … an inherently lethal instrument or device." ***Commonwealth v. McCullum***, 602 A.2d 313, 323 (Pa.Super. 1992). Further, the neck and head are vital parts of the body. ***Montalvo, supra***.

> Death caused by strangulation is sufficient to infer the specific intent required for a conviction of first degree murder. ***See Commonwealth v. Harvey***, 514 Pa. 531, 538, 526 A.2d 330, 334 (1987) (appellant's admission that he placed strap around victim's neck and applied pressure until death resulted was sufficient to find specific intent);

- 17 -

> ***Commonwealth v. Johnson***, 459 Pa. 141, 147, 327 A.2d 124, 127 (1974) (placing knotted cord around neck of elderly woman and rigging it so as to strangle victim is consistent with specific intent to take the life of another); ***Commonwealth v. Graves***, [456 A.2d 561, 569 (Pa.Super. 1983)] (jury entitled to find the specific intent to kill required for first degree murder where ten year old child strangled to death).

***Commonwealth v. Simmons***, 662 A.2d 621, 629 (Pa.Super. 1995), *cert. denied*, 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996).

Instantly, Appellant told police that after having an argument with Ms. Hatfield, he walked to the closet, retrieved an extension cord, positioned himself behind where she was sitting, and strangled her until she went limp. After she was dead, Appellant placed a blanket on the floor, laid her body on the blanket, and waited two days before calling the police. The Commonwealth's expert forensic pathologist testified that Appellant would have had to hold the electrical cord tightly around Ms. Hatfield's neck for at least a minute to cause her death. Additionally, Ms. Butterfield's testimony established that Appellant inquired about how the family would treat him if something happened to Ms. Hatfield in the days immediately preceding her death. Viewed in the light most favorable to the Commonwealth as verdict winner, the evidence was sufficient for the jury to infer that Appellant strangled Ms. Hatfield with the specific intent to kill her. ***See Montalvo, supra***; ***Simmons, supra***. ***See also Hansley, supra***. Accordingly, Appellant's third issue fails, and we affirm the judgment of sentence.

Judgment of sentence affirmed.

- 18 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/3/2022</u>