J. S63003/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                 :            PENNSYLVANIA
                   v.                  :

JAMAR MATTHEWS,               :        No. 2468 EDA 2015
                                                 :
             Appellant      :


Appeal from the Judgment of Sentence, June 26, 2015,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0003979-2014


BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND FITZGERALD,* JJ.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:     **FILED SEPTEMBER 16, 2016**

Jamar Matthews appeals from the June 26, 2015 aggregate judgment of sentence of 13 to 26 years' imprisonment imposed after he was found guilty of attempted murder, criminal conspiracy to commit murder, aggravated assault, possession of a firearm, carrying a firearm without a license, carrying a firearm on public streets or public property in Philadelphia, and possessing instruments of crime ("PIC").[1]  After careful review, we affirm.

The trial court summarized the relevant facts of this case as follows:

> [O]n November 29, 2013, at approximately 9:45 p.m., [Philadelphia Police Officer Milord Celce]

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 901, 903, 1102(c), 2702, 6105, 6106, 6108, and 907, respectively.

received a radio call for a shooting and person with a gun at 2603 West Harold Street in Philadelphia. Officer Celce, who was approximately four (4) blocks away at the time, promptly arrived at the above location, where he observed bullet holes in the windows and encountered the complainant, Enoch Carter. Based on his conversation with Mr. Carter, they proceeded to 2642 North 26th Street -- literally just around the corner, not even 30 seconds later --where they met Highway Patrol Officer Reid, and knocked on the door. Appellant, who was in a wheelchair, answered the door; his cohort, Co-Defendant Karie Dozier (hereinafter "Dozier"), was seated on a couch directly facing the front door of the residence. As soon as Mr. Carter saw Dozier, he yelled and pointed to him, [t]hat's the guy.

Officer Celce placed Dozier on the floor to detain him. He lifted the cushion where Dozier was sitting and recovered a handgun; Dozier was sitting on the gun. Officer Celce escorted Dozier outside, where he was positively identified by Mr. Carter, and took him into custody. Mr. Carter also was transported to Central Detectives for an interview, during which Officer Celce learned of [a]ppellant's involvement; he then went back to the residence and placed [a]ppellant under arrest at 12:15 a.m.

. . . . Mr. Carter testified that, prior to the shooting, he had lived around the corner from [a]ppellant for approximately one and one-half (1½) years and was friends with him. Mr. Carter used to hang out with [a]ppellant frequently, and also helped him with chores such as laundry and grocery shopping. Several weeks before the shooting, on October 17, 2013, [a]ppellant was driving a van (with handicapped hand controls) in which Mr. Carter and a female friend of [a]ppellant were riding as passengers. Approaching a red light, [a]ppellant mistook the accelerator for the brakes, and crashed into a building, injuring Mr. Carter and the female. Appellant was arrested at the scene for his involvement in the crash. Mr. Carter was

transported to the hospital via ambulance for treatment and subsequently required physical therapy for his injuries. Several weeks later, Mr. Carter commenced a personal injury lawsuit against [a]ppellant, which [a]ppellant took to heart. Appellant thereafter had several different individuals approach Mr. Carter to persuade him to "drop" the lawsuit, including a younger gentleman earlier on the day of the shooting, who proposed a fistfight in front of [a]ppellant's residence. Mr. Carter declined the proposal and went home.

Later that evening, at approximately 9:40 p.m., Co-Defendant Dozier knocked on Mr. Carter's door. Mr. Carter stuck his head out of his second-story window to see who it was. Dozier asked him why he had a beef with [a]ppellant; Mr. Carter explained that he did not have a problem with [a]ppellant, it was [a]ppellant who had a problem with him due to the lawsuit. After speaking with Dozier for five (5) to seven (7) minutes, [a]ppellant approached on his wheelchair and parked it next to Dozier. Dozier then asked [a]ppellant, "what do you want me to do[?]" at which point [a]ppellant said "go ahead[.]" Right on cue, Dozier retrieved a black handgun, pointed it at Mr. Carter and opened fire. Mr. Carter saw the flash from the gun, and a bullet went through his window; he fell back into the home. As he was falling, Dozier fired several more shots at him. Fortunately, none of the bullets struck Mr. Carter, who immediately dialed 911 to summon police. During the call, he provided a physical description of Dozier and reported [a]ppellant's involvement. A few minutes later, he accompanied police to [a]ppellant's residence, where Dozier and the handgun were taken into custody following Mr. Carter's positive identification.

. . . . [Ballistics expert and] Philadelphia Police Officer Jesus Cruz testified that he test-fired the handgun that Dozier was sitting on and compared the fired cartridge casing ("FCC") with the five (5) FCCs recovered in front of Mr. Carter's residence. Based on his analysis, which was peer-reviewed, he

concluded to a reasonable degree of scientific certainty that each of the five (5) FCCs recovered at the scene was, in fact, fired from Dozier's handgun.

. . . Philadelphia Police Detective Michael Repici . . . testified that, on November 29, 2013, he was assigned to investigate this matter. At approximately 11:35 p.m., he interviewed Mr. Carter at Central Detectives. When Mr. Carter described [a]ppellant's involvement, Detective Repici asked Officer Celce -- who was present -- if he knew where this guy is? Officer Celce responded, [y]eah, he's still back there, at which point Detective Repici directed him to arrest [a]ppellant. Officer Celce embarked on this quest a few minutes prior to 12:00 a.m.

Detective Repici then went to the crime scene, 2603 Harold Street, which was being held, or secured, by fellow officers. There, he recovered under property receipt four (4) FCCs on the pavement and one (1) FCC in the street, all in close proximity to each other in front of Mr. Carter's residence. He also took photographs of all the evidence, including the bullet holes in the windows and inside the residence, which he described as the photos were displayed to the jury. Detective Repici then proceeded to 2642 North 26th Street, where he took photographs of the couch and black handgun, the latter of which he recovered under property receipt.

Finally, the Commonwealth introduced via stipulation: (a) certificates of non-licensure with respect to both [a]ppellant and Dozier, establishing that neither male was licensed to carry a firearm and thus not permitted to carry a firearm in Pennsylvania; (b) authenticity of prison phone call records between [a]ppellant and Dozier, in which they discuss methods to prevent the case from going forward -- which recordings were played for, and their transcripts displayed to, the jury.

Trial court opinion, 12/24/15 at 2-5 (citations to notes of testimony, footnotes, and some internal quotation marks omitted).

Appellant was arrested in connection with this incident and charged with the aforementioned offenses on April 15, 2014. On April 21, 2015, appellant proceeded to a jury trial alongside co-defendant Dozier.[2] Following a three-day trial, the jury found appellant guilty of attempted murder, criminal conspiracy to commit murder, aggravated assault, carrying a firearm without a license, carrying a firearm on public streets or public property in Philadelphia, and PIC. That same day, the trial court found appellant guilty of possession of a firearm. Following the completion of a pre-sentence investigation ("PSI") report, the trial court sentenced appellant to 13 to 26 years' imprisonment on June 26, 2015. On July 6, 2015, appellant filed post-sentence motions for judgment of acquittal and for reconsideration of his sentence. The trial court denied appellant's post-sentence motions on July 8, 2015. This timely appeal followed on August 6, 2015.[3]

On appeal, appellant raises the following issues for our review:

> I.   Did the admission of a statement by a non-testifying co-defendant implicate [a]ppellant in the shooting for which he was charged, thereby violating [a]ppellant's right of confrontation, and was the error in admitting the statement not harmless?

---

[2] Dozer has also filed an appeal to this court at No. 2171 EDA 2015.

[3] Appellant and the trial court have complied with Pa.R.A.P. 1925.

II.   Was the evidence insufficient to prove that [a]ppellant had the specific intent to kill, which was required to prove him guilty of either attempted murder or conspiracy to murder?

III.  Did the trial court abuse its discretion by imposing a sentence that was above the aggravated range of the sentencing guidelines absent aggravating factors not already included in the sentencing guidelines?

Appellant's brief at 5.

Appellant first argues that his rights under the Confrontation Clause[4] were violated when the trial court permitted the Commonwealth to introduce a statement of Dozier that implicated him in the shooting. (*Id.* at 12.) Specifically, at trial, the Commonwealth introduced recordings of Dozier's prison telephone conversations with appellant wherein they discuss bribing Carter so he would not testify against them. (**See** Commonwealth's Exhibit 24.) During the course of these conversations, Dozier stated to appellant as follows:

> Yea, but listen though, like you know what I'm saying, but listen like tell that n***a like we waving the white flag man like, tell that n***a like he got to check whatever dawg.

*Id.* at 3.  Appellant challenges the admission of this statement on the grounds it violated the United States Supreme Court's decision in **Bruton v.**

---

[4] The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

*United States*, 391 U.S. 123 (1968), and its progeny. (Appellant's brief at 13-14.) This claim is meritless.

In the seminal case of *Bruton*, the United States Supreme Court recognized a narrow exception to the general rule that cautionary instructions are sufficient to eradicate any potential prejudice in joint trials. *Bruton*, 391 U.S. at 124-126. The United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at trial, even if the jury is instructed to consider that confession only against the co-defendant. *Id.* at 135-136.

Our supreme court has recently summarized *Bruton* and its progeny as follows:

> The general rule in a joint trial of co-defendants is that the law presumes that the jury can follow an appropriate instruction, which explains that evidence introduced with respect to only one defendant cannot be considered against other defendants. *Bruton* departed from this salutary general rule only by concluding that where there are "powerfully incriminating statements" admitted against a non-testifying co-defendant who stands side by side with the accused, such statements can be devastating as well as inherently suspect when they shift the blame to the accused. Following *Bruton*, the U.S. Supreme Court has approved redaction and a limiting instruction as a means of eliminating the possible spillover prejudice arising from the admission of a non-testifying co-defendant's confession against that co-defendant at a joint trial. *Bruton* and its progeny establish Sixth Amendment norms governing state criminal trials, and this Court has had ample opportunity to

consider and apply the precepts. In our own implementation of this federal law, we have explained that the challenged co-defendant's statement must be incriminating on its face and that redactions involving the substitution of neutral pronouns . . . instead of names or other obvious methods of deletion, do not obviously identify the other co-defendants.

*Commonwealth v. Daniels*, 104 A.3d 267, 294 (Pa. 2014) (citations omitted).

Applying these well-settled principles, we conclude that Dozier's statement did not give rise to a *Bruton* violation because it did not explicitly reference or facially incriminate appellant in any way. As the trial court recognized in its opinion, Dozier's statement "is a vague statement that does not even rise to being an admission or a defense strategy" and "can have multiple interpretations [] depending upon [] Dozier's state of mind, which is not of record." (Trial court opinion, 12/24/15 at 7.) Accordingly, *Bruton* and its progeny are not applicable to the case *sub judice* and appellant's claim of trial court error must fail.

Appellant next argues that the evidence was insufficient to support his convictions for attempted murder and criminal conspiracy to commit murder, as the Commonwealth failed to prove he and his co-defendant Dozier shared a specific intent to kill Carter. (Appellant's brief at 15.) Appellant maintains that "[a]t best, the evidence supports the inference that [he] solicited Dozier to engage in some form of retaliation against Carter." (*Id.* at 16.) We disagree.

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Thomas*, 988 A.2d 669, 670 (Pa.Super. 2009), *appeal denied*, 4 A.3d 1054 (Pa. 2010) (citations omitted).

"A person commits an attempt when with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of the crime." 18 Pa.C.S.A. § 901(a). A conviction for attempted murder requires the Commonwealth to prove beyond a reasonable doubt that the defendant "t[ook] a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act." *Commonwealth v. Tucker*, ___ A.3d ___, 2016 WL 4035602, at *7 (Pa.Super. July 19, 2016) (citation omitted). Criminal conspiracy, in turn, requires the Commonwealth to establish that appellant "(1) entered into an agreement to commit or aid in an unlawful act with another person or persons; (2) with a shared criminal intent; and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Mitchell*, 135 A.3d 1097, 1102 (Pa.Super. 2016).

It is the element of a willful, premeditated, and deliberate intent to kill that distinguishes first-degree murder from all other types of criminal homicide. "To convict a defendant of first-degree murder, the jury must find that (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill." *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008), *cert. denied*, 556 U.S. 1186 (2009) (citation omitted); 18 Pa.C.S.A. § 2502.

Viewing the evidence in the light most favorable to the Commonwealth, the verdict winner, we find that there was ample evidence for the jury to conclude that appellant possessed the specific intent to kill Carter. The testimony presented at trial established that appellant was angry with Carter for filing a lawsuit against him and made multiple attempts to persuade him to forgo the suit. (Notes of testimony, 4/22/15 at 10-14, 22-23, 97.) On the day of the alleged incident, appellant recruited another individual to challenge Carter to a fistfight in front of appellant's residence, to no avail. (*Id.* at 97.) Later that evening, appellant was observed alongside Dozier when he was speaking with Carter about the "beef" he had with appellant. (*Id.* at 15-18.) During the course of this conversation, appellant expressly directed Dozier to "go ahead." (*Id.* at 19.) The record reveals that Dozier fired five gunshots at Carter's head as he hung out of his second-story window, narrowly missing him. (*Id.* at 19-20, 68-69.)

Philadelphia Police Officer Celce found appellant and Dozier sitting together at appellant's residence minutes after this incident. (Notes of testimony, 4/21/15 at 90-92.)

We note that "[t]he firing of a bullet in the general area in which vital organs are located can in and of itself be sufficient to prove specific intent to kill beyond a reasonable doubt." *Commonwealth v. Manley*, 985 A.2d 256, 272 (Pa.Super. 2009), *appeal denied*, 996 A.2d 491 (Pa. 2010) (citation omitted). Moreover, this court has recognized that, "all conspirators are equally criminally responsible for the acts of their co-conspirators committed in furtherance of the conspiracy regardless of their individual knowledge of such actions and **regardless of which member of the conspiracy undertook the action**." *Commonwealth v. Figueroa*, 859 A.2d 793, 798 (Pa.Super. 2004) (citation omitted; emphasis added). Accordingly, appellant's sufficiency claims must fail.

In his final claim, appellant challenges the discretionary aspects of his sentence. Appellant argues that the trial court abused its discretion in imposing an excessive sentence above the aggravated range of the sentencing guidelines without considering any factors not already included in the guidelines or any mitigating factors. (Appellant's brief at 19.)

Challenges to the discretionary aspects of sentencing do not entitle a petitioner to review as of right. *See Commonwealth v. Allen*, 24 A.3d 1058, 1064 (Pa.Super. 2011). Rather, an appellant challenging the

discretionary aspects of his sentence must invoke this court's jurisdiction by satisfying the following four-part test:

> (1) whether the appeal is timely; (2) whether [a]ppellant preserved his issue; (3) whether [a]ppellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

*Commonwealth v. Carrillo-Diaz*, 64 A.3d 722, 725 (Pa.Super. 2013) (citations omitted).

Instantly, appellant filed a timely notice of appeal and preserved his issue in his post-sentence motion, but failed to include a separate statement of reasons relied upon for allowance of appeal in his brief, as required by Pa.R.A.P. 2119(f). "A failure to include the Rule 2119(f) statement does not automatically waive an appellant's argument; however, we are precluded from reaching the merits of the claim when the Commonwealth lodges an objection to the omission of the statement." *Commonwealth v. Bruce*, 916 A.2d 657, 666 (Pa.Super. 2007) (citation omitted), *appeal denied*, 932 A.2d 74 (Pa. 2007). Here, the Commonwealth has objected to the omission of appellant's Rule 2119(f) statement. (*See* Commonwealth's brief at 19.) Accordingly, we conclude that appellant has waived his challenge to the discretionary aspects of his sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2016