J-A19030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JEREMY MICHAEL COLLAZO | : | |
| | : | |
| Appellant | : | No. 1101 MDA 2021 |

Appeal from the Judgment of Sentence Entered July 13, 2021
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0005459-2018

BEFORE: BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.: **FILED: NOVEMBER 29, 2022**

Appellant, Jeremy Michael Collazo, appeals from the judgment of sentence entered in the Berks County Court of Common Pleas, following his jury trial convictions for three (3) counts of conspiracy and one (1) count of first-degree murder.[1] We affirm.

The trial court opinion set forth the relevant facts of this appeal as follows:

> [T]he Commonwealth presented evidence that on the night of July 23, 2018, Julissa Torres was celebrating her birthday at Nick's Cafe at 11th and Chestnut Streets in the City of Reading, Berks County, Pennsylvania. She and Dawud Felton left the bar shortly after 2:00 a.m. on the morning of the 24th and walked to her apartment at 338 South 10th Street. Along the way, they encountered Carlos Herrera and

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 903, 2502(a), respectively.

a companion of his named Eddie.

Ms. Torres and her friends entered her second-floor apartment, where her three children and their babysitter were also present. Ms. Torres and the others were inside the apartment for a short time before they heard gunshots outside her door. Ms. Torres testified that she and the others ran upstairs, but that Dawud Felton then went back downstairs to help Carlos, who had been shot. Carlos Herrera died at the scene and his body was transported to the Reading Hospital by Deputy Coroner Melissa Spuhler. Dr. Neil Hoffman, a forensic pathologist, testified that the cause of death was a gunshot wound to the chest.

Julissa Torres testified that when she talked to the police, she told them that she thought that Michael Richardson, whose nickname is Goblin, and [Appellant], whose nickname is Flow, were the shooters. Ms. Torres had been having problems with Michael Richardson, and she testified that [Appellant] was always with him. Ms. Torres testified that the night before her birthday, shots were fired at her uncle's house at 934 Muhlenberg Street. Ms. Torres testified that she called Michael Richardson in response and threatened to harm his mother.

Ms. Torres further testified that Robert, her daughter's father, had recently shot at Michael Richardson and [Appellant]. No one was hit by the bullets, but one of the bullets struck [Appellant's] car. In addition, Ms. Torres testified that earlier in July, she had been walking to a store in the area of 11th and Cotton Streets when Michael Richardson, who was in a car with [Appellant], pointed a gun at her. Michael Richardson told her that he's going to get a clear shot.

The Commonwealth also introduced communication that occurred on Facebook between Michael Richardson and Ms. Torres into evidence. Ms. Torres's account was named "Ju Staymentioned" and Michael Richardson's account was named "Desperado Hitta." Many of the messages were threatening in nature. For example, Michael Richardson replied, "Because I was gonna shoot you" in response to Ms. Torres's question about why he pulled his gun out. Ms. Torres testified that she was not having problems with

- 2 -

anyone other than Michael Richardson around the time of the homicide.

Following the murder of Carlos Herrera, Officer Christopher Bucklin of the Reading Police Department obtained video surveillance footage from Nick's Cafe at 1050 Chestnut Street, from 401 South 9th Street, and from 420 Orange Street in the City of Reading. The video from 401 South 9th Street depicts two males walking north on 9th Street near the time of the murder. The video from 420 Orange Street depicts two individuals running east away from the scene of the homicide. The video from 420 Orange Street was captured four or five minutes after the video from 401 South 9th Street. The location of the cameras relative to the scene of the homicide is depicted in Commonwealth Exhibit 86. Screen captures depicting the two men from the video taken at 401 South 9th Street were introduced into evidence as Commonwealth Exhibits 84 and 85. [Appellant] is depicted in Commonwealth Exhibit 85.

Criminal Investigator Daniel Cedeno testified that as part of his investigation, he obtained messages from Facebook that were exchanged between [Appellant] and Michael Richardson. On the night of July 23, 2018, Michael Richardson asked [Appellant] if he felt like "eliminating this problem?" Appellant replied, "I'm with it." They then discussed going to Nick's and that it was "shorty's birthday." When [Appellant] asked, "How we gonna do this," Michael Richardson responded that he will "tell you when we link," meaning meet.

Facebook records also established that [Appellant] searched for "Juju Marie," who is Julissa Torres, at approximately 1:18 a.m. on July 24, 2018. In addition, Facebook messages were introduced where [Appellant] was planning the shooting at Julissa Torres's uncle's house. [Appellant] also discussed Michael Richardson pointing a gun at Julissa Torres at 11th and Cotton Streets on Facebook. Finally, while discussing the disagreement with Julissa Torres, [Appellant] wrote, "They shot at us four or five times to our one that really counted."

Criminal Investigator Cedeno interviewed [Appellant] after he was taken into custody in Massachusetts. When

- 3 -

[Appellant] was shown a picture of Michael Richardson, he acknowledged that he knew him as Goblin. [Appellant] also acknowledged that he was aware that Michael Richardson and Julissa Torres had been exchanging threats. [Appellant] initially denied any involvement in the homicide, but when he was told that there was video evidence, he admitted that he was at the scene of the crime.

[Appellant] stated that he was picked up that evening and that Michael Richardson and two other individuals were in the car. [Appellant] described Richardson as "raging," but said that Richardson told him he was going to Julissa Torres's residence to talk. [Appellant] stated that after the driver of the car parked the vehicle on Laurel Street, he, Michael Richardson, and a man named Luis Sanabria walked on foot to Julissa Torres's home. [Appellant] said that he remained in an alley while Michael Richardson and Luis Sanabria walked up the stairs to Julissa Torres's second floor apartment. [Appellant] stated that Michael Richardson opened the apartment door and that moments later he heard gunshots. After hearing the gunshots, [Appellant] said that he ran back to the vehicle. The video surveillance footage refutes [Appellant's] account of the events. In addition, after being told that his fingerprints had been recovered from a .22 caliber firearm that was used in the shooting, [Appellant] stated that Michael Richardson left the weapon in his vehicle and that he gave it back to Richardson.

(Trial Court Opinion, filed 10/28/21, at 3-7) (internal record citations omitted).

On December 24, 2018, the Commonwealth filed a criminal information charging Appellant with offenses related to the shooting. Appellant proceeded to trial, and a jury found him guilty of first-degree murder and related offenses. On July 13, 2021, the court sentenced Appellant to life imprisonment for the murder conviction. Appellant timely filed post-sentence

motions, which the court denied.[2]

Appellant filed a notice of appeal on August 19, 2021. On August 23, 2021, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant timely filed his Rule 1925(b) statement on September 10, 2021.

Appellant now raises three issues for this Court's review:

> Was there insufficient evidence to support Appellant's convictions for murder of the first degree, conspiracy to commit murder of the first degree, and two counts of conspiracy to commit aggravated assault?

> Were Appellant's convictions for murder of the first degree, conspiracy to commit murder of the first degree, and two counts of conspiracy to commit aggravated assault against the weight of the evidence?

> Did the trial court abuse its discretion in removing juror number 10 immediately before deliberations as there was no evidence her deliberations would be affected simply because she knew someone sitting in the courtroom?

_____

[2] The trial court docket indicates that the post-sentence motion was filed and denied on September 22, 2021, after Appellant filed a notice of appeal on August 19, 2021. Consequently, this Court directed Appellant to show cause why the appeal should not be quashed. Appellant filed multiple responses stating that he timely filed a post-sentence motion on July 22, 2021, which the court denied on July 26, 2021. Appellant attached a copy of the July 26, 2021 order denying the post-sentence motion, which also appears in the certified record. Appellant further explained that he filed two (2) motions on July 22, 2021: the post-sentence motion and a motion for the withdrawal of counsel. Due to a clerical error, the trial court docketed the withdrawal motion on July 22, 2021, without docketing the post-sentence motion. To correct this error, the court belatedly docketed the post-sentence motion on September 22, 2021, and the court re-filed the order denying the post-sentence motion that same day. Significantly, Appellant provided this Court with a letter from the trial judge's law clerk that confirms this sequence of events. (**See** Response to Rule to Show Cause, filed 11/29/21, at Exhibit B).

- 5 -

(Appellant's Brief at 8).

Our standard of review for sufficiency claims is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Tucker*, 143 A.3d 955, 964 (Pa.Super. 2016), *appeal denied*, 641 Pa. 63, 165 A.3d 895 (2017) (quoting *Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011)).

In reviewing a challenge to the weight of the evidence, our standard of review is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the…verdict if it is so contrary to the evidence as to shock one's sense of justice.

- 6 -

> ***Commonwealth v. Small***, 559 Pa. 423, [435,] 741 A.2d
> 666, 672-73 (1999). Moreover, where the trial court has
> ruled on the weight claim below, an appellate court's role is
> not to consider the underlying question of whether the
> verdict is against the weight of the evidence. Rather,
> appellate review is limited to whether the trial court palpably
> abused its discretion in ruling on the weight claim.

***Commonwealth v. Champney***, 574 Pa. 435, 444, 832 A.2d 403, 408

(2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004)

(most internal citations omitted).

Additionally, the Crimes Code defines the offense of criminal conspiracy

as follows:

> **§ 903. Criminal conspiracy**
>
> **(a) Definition of conspiracy.**—A person is guilty of
> conspiracy with another person or persons to commit a
> crime if with the intent of promoting or facilitating its
> commission he:
>
> > (1) agrees with such other person or persons that they
> > or one or more of them will engage in conduct which
> > constitutes such crime or an attempt or solicitation to
> > commit such crime; or
> >
> > (2) agrees to aid such other person or persons in the
> > planning or commission of such crime or of an attempt
> > or solicitation to commit such crime.
>
> \* \* \*
>
> **(c) Conspiracy with multiple criminal
> objectives.**—If a person conspires to commit a number of
> crimes, he is guilty of only one conspiracy so long as such
> multiple crimes are the object of the same agreement or
> continuous conspiratorial relationship.

18 Pa.C.S.A. § 903(a), (c).

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent, and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Melvin*, 103 A.3d 1, 42 (Pa.Super. 2014) (citation omitted).

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt.

*Id.* at 42-43. "Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." *Commonwealth v. Barnes*, 871 A.2d 812, 820 (Pa.Super. 2005), *aff'd*, 592 Pa. 301, 924 A.2d 1202 (2007).

The Crimes Code defines first-degree murder as follows:

**§ 2502. Murder**

> **(a)    Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S.A. § 2502(a).

> To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that he or she unlawfully killed a human being and did so in an intentional, deliberate and premeditated manner.
>
> > It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. …
>
> The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence.

***Commonwealth v. Schoff***, 911 A.2d 147, 159-60 (Pa.Super. 2006) (internal citations and quotation marks omitted).  "Specific intent to kill can be established though circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body."  ***Commonwealth v. Montalvo***, 598 Pa. 263, 274, 956 A.2d 926, 932 (2008), *cert. denied*, 556 U.S. 1186, 129 S.Ct. 1989, 173 L.Ed.2d 1091 (2009).

Regarding a trial court's decision to remove a juror, we note:

> The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion.  This discretion exists even after the jury has been impaneled and the juror sworn.  [T]he common thread of the cases is that the trial judge, in [their] sound discretion, may remove a juror and replace [them] with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform [their] duty as a juror is impaired.

*Commonwealth v. Marrero*, 217 A.3d 888, (Pa.Super. 2019), *appeal denied*, ___ Pa. ___, 226 A.3d 968 (2020) (internal citations and quotation marks omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Griffiths*, 15 A.3d 73, 76 (Pa.Super. 2010) (quoting *Commonwealth v. Dent*, 837 A.2d 571, 577 (Pa.Super. 2003), *appeal denied*, 581 Pa. 671, 863 A.2d 1143 (2004)).

After a thorough review of the certified record, the parties' briefs, and the relevant law, we conclude the record supports the trial court's determination. *See Champney, supra*; *Marrero, supra*; *Tucker, supra*. Consequently, we affirm the judgment of sentence for the reasons stated in the opinion that the Honorable Eleni Dimitriou Geishauser entered on October 28, 2021.

Regarding the Commonwealth's evidence, Judge Geishauser emphasized the video surveillance evidence, the Facebook messages between Appellant and Mr. Richardson, and Appellant's own statements during his police interview. The court noted that "[t]hese facts, taken together, were sufficient to allow the jury as factfinder to conclude that [Appellant] was guilty" of the offenses at issue. (Trial Court Opinion at 7). Likewise, the court concluded that the verdict was not so contrary to the evidence as to shock

one's sense of justice.  (**See id.** at 8).

Regarding the removal of juror number 10, the court analyzed the on-the-record interview with the juror that occurred after the court learned that the juror knew someone in the gallery.  During this interview, the juror expressed some concern about the possibility of "backlash" if the verdict did not "go in favor" of Appellant's supporter in the gallery.  (**See id.** at 9). Considering the juror's statements during the on-the-record interview, the court felt justified in excusing the juror.  As to the foregoing points, we adopt Judge Geishauser's reasoning as our own.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2022