J-A24028-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
                                           :
               v.                         :
                                           :
CHAD RANNELS                        :
                                         :
           Appellant            :    No. 1230 EDA 2022

Appeal from the Judgment of Sentence Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006312-2018

BEFORE: STABILE, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY DUBOW, J.:                  **FILED APRIL 5, 2024**

Appellant Chad Rannels appeals from the judgment of sentence entered by the Philadelphia County Court of Common Pleas on March 29, 2022, after a jury convicted him of First-Degree Murder and related charges. Appellant claims that the trial court abused its discretion in denying a motion for mistrial, challenges the sufficiency of the evidence, and argues that the verdict was against the weight of the evidence. After careful review, we affirm the judgment of sentence.

In March 2022, a jury convicted Appellant, Michael Blackston, Semaj Armstead, and Rashawn Combs of charges related to the December 2011 murder of Kevin Drinks ("Decedent"), who they mistakenly believed was a

witness to a prior murder for which Appellant was awaiting trial.[1] The relevant factual and procedural history is as follows.

In 2011, Philadelphia police arrested Appellant for the July 30, 2011 murder of Kristin Freeman. While in prison awaiting his preliminary hearing, Appellant made at least fourteen recorded phone calls between September 27, 2011, and December 9, 2011, including several to Blackston and Armstead. During these calls, Appellant provided an address and description of a person he believed was an eyewitness to the murder named John Fisher. Appellant repeatedly instructed the co-defendants to be on their "A-Game." Trial Ct. Op, 11/8/22, at 2.

On December 10, 2011, four days prior to Appellant's scheduled preliminary hearing, Blackston, while standing on a corner with Armstead, Combs, and Eugene Floyd, saw Decedent drive by them in a white truck. . Blackston believed that Decedent was the eyewitness, Mr. Fisher. It is undisputed that Decedent had an "uncanny" resemblance to Mr. Fisher and that they both drove white trucks. N.T., 3/24/22, at 93.

The four men immediately entered vehicles and followed Decedent in his white truck. Floyd drove Blackston in a Chevrolet minivan, while Combs drove Armstead in a white PT Cruiser. The police eventually discovered that

_____

[1] Appellants' co-defendants have also appealed their judgments of sentence. The dispositions in **Commonwealth v. Blackston**, 1367 EDA 2022, and **Commonwealth v. Armstead**, 1269 EDA 2022 have been filed in conjunction with the instant case. **Commonwealth v. Combs**, 3161 EDA 2022, which was submitted after the others, is pending before a different panel.

Armstead's sister owned the minivan and Blackston's girlfriend owned the PT Cruiser.

Appellant's co-conspirators followed Decedent for approximately six hours while Decedent made deliveries and while the co-conspirators "maintain[ed] constant communication with each other." Trial Ct. Op. at 4. Prior to the murder, Floyd parked the minivan close to the area where Decedent had parked the white truck. Blackston exited the minivan with a firearm and walked to the area where Decedent had parked the white truck. He returned to the minivan a few minutes later and told Floyd that there were cameras near Decedent's truck. Floyd and Blackston then drove to a different location approximately 15-20 minutes away. Blackston exited the vehicle and returned soon after "wearing a black Muslim face covering and gown." *Id.*.

Floyd and Blackston then drove back to the location where Decedent had parked the white truck. Blackston again exited the minivan with the firearm. He ran to the white truck and fired five to six rounds, fatally shooting Decedent. Blackston then fled. Police arrived minutes later and transported Decedent to the hospital where he was pronounced dead.

During the initial investigation, police recovered surveillance video footage from the area of the murder, from which they identified the PT Cruiser as a vehicle of interest. Detectives, however, did not connect the co-conspirators to the crime until 2018, when they reviewed Appellant's prison phone calls and obtained the co-conspirators' cell phone records and historical

cell site data. Ultimately, the Commonwealth charged Appellant and his three co-defendants with murder and related crimes.

In March 2022, the trial court presided over a joint jury trial of Appellant and his co-defendants. Floyd, to whom the Commonwealth had granted immunity, testified to the narrative set forth above. The jury also viewed a chronological compilation video of surveillance camera footage. As described by the trial court, the video depicted the PT Cruiser following a white box truck and showed vehicles consistent with the PT Cruiser and the minivan circling the murder scene between 5:48 p.m. and 6:16 p.m., prior to the 6:17 p.m. murder, as well as an individual, apparently in "Muslim garb" approach the white box truck twice. Trial Ct. Op. at 18-19. Detectives additionally testified to the cell phone records and historical cell site data, which traced the co-conspirators' movements on the day of the murder. Finally, the jury heard the recordings of Appellant's prison phone calls.

On March 29, 2022, the jury convicted Appellant of First-Degree Murder, Criminal Solicitaion of Murder, and Conspiracy to Commit Murder.[2] On the same day, the trial court imposed on Appellant a mandatory minimum sentence of life imprisonment without the possibility of parole for Murder and a consecutive sentence of 10 to 20 years of imprisonment for Solicitation of Murder, while finding the conviction for Conspiracy to Commit Murder merged for sentencing purposes.

_____

[2] 18 Pa.C.S. §§ 2502, 902(a), and 903(c), respectively.

On April 7, 2022, Appellant filed a post-sentence motion, claiming that the verdict was against the weight of the evidence and that the court erred in denying a motion for mistrial. On the same day, the trial court denied the post-sentence motion. On April 29, 2022, appellate counsel filed a timely notice of appeal. The trial court and Appellant complied with Pa.R.A.P. 1925.

Appellant raises the following issues to this Court, which we have reordered:

1. Did the trial court err and cause irreparable harm to Appellant in denying Appellant's Motion for a Mistrial because the prosecutor engaged in prosecutorial misconduct by engaging in a pattern of eliciting bolstering and prejudicial testimony, including precluded testimony regarding a prior attempt to kill a cooperating witness and, therefore, a new trial should be ordered?

2. Should Appellant's judgment of sentence be vacated because there was insufficient evidence beyond a reasonable doubt that Appellant was guilty of [F]irst-degree Murder, [S]olicitation of [F]irst-degree Murder, or [C]onspiracy to [C]ommit [F]irst-degree Murder because, *inter alia*, Appellant was incarcerated when the underlying Murder occurred and Appellant's prison telephone calls did not establish that Appellant solicited or conspired to kill Decedent at any time?

3. Did the trial court err in denying Appellant's post-sentence [m]otion as to the weight of the evidence of all convictions because Appellant was incarcerated when the underlying Murder occurred and Appellant's prison telephone calls did not establish that Appellant solicited or conspired to kill Decedent at any time?

Appellant's Br. at 4.

## A.

In his first issue, Appellant asserts that the trial court erred in not granting a mistrial due to asserted prosecutorial misconduct. In considering this issue, we reiterate that an appellate court will not overturn a trial court's

denial of a mistrial absent an abuse of discretion.  **Commonwealth v. Leap**, 222 A.3d 386, 392 (Pa. Super. 2019) (citation omitted).

When reviewing a motion for mistrial based upon prosecutorial misconduct, courts recognize that "not every inappropriate remark by a prosecutor constitutes reversible error[;]" rather, prosecutorial misconduct occurs only when "the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." **Commonwealth v. Noel**, 53 A.3d 848, 858 (Pa. Super. 2012) (citation omitted).  In reviewing a trial court's determination to deny a mistrial, we recognize that "[t]he trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury[.]" **Commonwealth v. Rega**, 933 A.2d 997, 1016 (Pa. 2007) (citation omitted). Additionally, where the trial court provides a cautionary instruction to address the alleged prejudice, we presume that the jury will follow the instruction. **Leap**, 222 A.3d at 392.  Where the instruction is adequate, the grant of a mistrial is not necessary. **Id.**

Appellant argues that the trial court erred in refusing to grant a mistrial despite the Commonwealth engaging in prosecutorial misconduct by "eliciting bolstering and prejudicial testimony[.]"  Appellant's Br. at 7, 8-17.  Appellant bases his claims on the trial testimony of FBI Special Agent William Shute and Detective John Verrecchio.  Special Agent Shute testified regarding the 2011 historical cell site data used to track the movement of the coconspirators'

phones on the day of the murder. During his testimony, the prosecutor queried whether Detective Verrecchio would have been "the investigator who determined that he wanted to analyze these cell phone numbers." Special Agent Shute responded: "Yes. Yes, in fact, I have worked with Detective Verrecchio for 17 years. One of the most knowledgeable detectives I've worked with." N.T., 3/24/22, at 176. Appellant's counsel objected to this statement as "commentary." *Id.* The trial court sustained the objection.

The next day, Detective Verrecchio testified regarding his investigation, specifically addressing the prison call recordings, the cell phone records, and the process of obtaining search warrants for the cell phone records. The detective stated that he initially was not interested in Blackston's cell phone records because his phone went "off network" three hours prior to the murder. N.T., 3/25/222, at 58-59. The detective explained, however, that he subsequently "went back to the records and reviewed them" when he "learned of a previous or prior attempt to kill the witness[.]" *Id.* at 59.

Blackston's counsel, joined by Appellant's counsel, objected and moved for a mistrial. After the jury left the courtroom, Blackston's counsel asserted that there had been no information to support the detective's statement regarding a "previous attempt to kill a witness" and emphasized Detective Verrecchio's "editorializing and prejudicial remarks." *Id.* at 60. Appellant's counsel expanded the motion to address what he claimed were witnesses bolstering other investigators, referencing Special Agent Shute's testimony

from the day before and asserting that Detective Verrecchio engaged in a "monologue about search warrants[.]" *Id.* at 62.

After hearing argument, the court denied the motion for mistrial but offered to provide a cautionary instruction, which co-defendants' counsel later submitted. The trial court heard additional testimony from Detective Verrecchio outside the presence of the jury where he clarified that the "prior attempt" related to the incident described by Floyd when Blackston walked to the Decedent's white truck and returned, asserting that there were cameras around the truck. *Id.* at 75.

The trial court cautioned Detective Verrecchio to testify to his investigation without addressing the process of obtaining search warrants. After the jury returned, the trial court provided the following cautionary instruction:

> Before we broke, Detective Verrecchio was explaining what he did. Detective Verrecchio's testimony, the purpose is to explain what information he gathered, what he did with that information and how he proceeded forward with his investigation.
>
> It will be up to you, ladies and gentlemen, to evaluate the information being presented by Detective Verrecchio and what was done with that information; just like you're going to evaluate all other testimony being presented to you from all other witnesses.

*Id.* at 77. While the trial court did not include the portion of the counsels' proposed instruction that the jury should disregard Detective Verrecchio's reference to "any prior attempt to murder a witness[,]" none of the

defendants' counsel objected to this omission and thus, waived any objection to it. Id. at 68-69, 77.

After review, we conclude that the trial court did not abuse its discretion in denying Appellant's request for a mistrial based upon Appellant's claim of prosecutorial misconduct. We find the record supports the trial court's determination that Appellant failed to "demonstrate that the Commonwealth engaged in any sort of pattern of eliciting prejudicial testimony such that the Commonwealth's actions could be fairly characterized as prosecutorial misconduct." Trial Ct. Op. at 30.

First, in addressing Special Agent Shute's commentary regarding Detective Verrecchio, the trial court correctly noted that the prosecutor did not elicit the character description of Detective Verrecchio in any way but merely asked whether the detective had requested the special agent to analyze the phone records. *Id.* at 30. Moreover, the trial court properly sustained Appellant's objection. N.T., 3/24/22, at 176.

Similarly, the Commonwealth did not prompt Detective Verrecchio to reference a "prior attempt to kill" but rather asked Detective Verrecchio to explain his reasons for seeking Blackston's cell phone records even though his phone was turned off at the time of the murder. Trial Ct. Op. at 30-31. The court noted that the detective's description was a reasonable characterization of Blackston's initial approach to the truck. *Id.* Additionally, the court addressed any potential prejudice by issuing cautionary instructions to which

counsel did not object. Accordingly, we conclude that the trial court did not abuse its discretion in denying Appellant's request for a mistrial.

**B.**

Appellant's second claim challenges the sufficiency of the evidence, which presents a question of law. ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000). Accordingly, "our standard of review is de novo[,] and our scope of review is plenary." ***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013).

"When reviewing a challenge to the sufficiency of the evidence, we evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn from the evidence." ***Commonwealth v. Lake***, 281 A.3d 341, 345 (Pa. Super. 2022), *appeal denied*, 291 A.3d 333 (Pa. 2023). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." ***Widmer***, 744 A.2d at 751. "The Commonwealth can meet its burden by wholly circumstantial evidence." ***Commonwealth v. Benito***, 133 A.3d 333, 335 (Pa. Super. 2016) (citation omitted).

Appellant challenges his convictions for First-Degree Murder, Solicitation of Murder, and Criminal Conspiracy. "To convict a defendant of first-degree murder, the jury must find that (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill." ***Commonwealth v. Montalvo***, 956 A.2d 926, 932

(Pa. 2008) (citing 18 Pa.C.S. § 2502(a)). "Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body." ***Commonwealth v. Padilla***, 80 A.3d 1238, 1244 (Pa. 2013). In cases such as this where Appellant did not fire the fatal shots, a defendant can nonetheless be convicted of First-Degree Murder based upon conspiratorial liability where "the defendant personally harbored a specific intent to kill." ***Commonwealth v. Smyrnes***, 154 A.3d 741, 746 (Pa. 2017).

To establish sufficient evidence for Conspiracy, the Commonwealth must prove: "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another . . . to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." ***Montalvo***, 956 A.2d at 932 (citation omitted); ***see also*** 18 Pa.C.S. § 903(a)(1).

Finally, "[a] person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime . . . ." 18 Pa.C.S. § 902(a).

Appellant argues that the Commonwealth failed to present sufficient evidence to convict him of First-Degree Murder, Solicitation of Murder, or Conspiracy to Commit Murder. Appellant's Br. at 21-24. Appellant emphasizes that he was incarcerated at the time of the murder and contends that the prison tapes did not include any "direct instruction from Appellant to

- 11 -

any defendant to kill John Fisher much less [Decedent] who was alleged to resemble Fisher." *Id.* at 23. After careful review of the record, we disagree.

As the trial court concluded, the Commonwealth presented sufficient evidence to convict Appellant of Murder, Solicitation of Murder, and Conspiracy to Commit Murder, even though he was in prison at the time of the crime, based upon the recorded prison phone calls and the acts of his co-conspirators.

The trial court provided the following summary of the relevant exchanges during the prison phone calls:

> Appellant told Blackston and Armstead he "need[ed]" them on their "'A' game" and requested that they "take care" of matters on the outside. Blackston replied affirmatively, stating he was "on full throttle" while Armstead told Appellant "[w]e definitely got you[.]" * * * * In these calls, Appellant mentioned retrieving information about eyewitnesses from the Philadelphia Police Arrest Report, described the eyewitness to Blackston with the words "glasses" and "dark skin," and provided him with an address. Appellant later confirmed these same details for Blackston, who stated his intent to "bump into that bitch." Appellant subsequently told Blackston to "get that joint" out of the way and reiterated that he needed him and Armstead "on top" of it. Months later, Blackston reaffirmed his commitment to Appellant, telling him it was "on go street."

Trial Ct. Op., 11/22/22, at 38-39. When viewed in a light most favorable to the Commonwealth, the recordings establish that Appellant repeatedly requested that Blackston and Armstead eliminate the witness to the Freeman murder, for whom Appellant provided a description and an address. Additionally, the surveillance video and the co-conspirators' cell phone records

support Floyd's narrative of actions that the co-conspirators took in support of the conspiracy, culminating in Blackston fatally shooting Decedent.

This evidence is sufficient to convict Appellant of First-Degree Murder, via conspiratorial liability, because Appellant had a specific intent to unlawfully kill the witness, entered into an agreement with his co-conspirators to kill the witness, and his co-conspirators engaged in overt acts up to and including Blackston fatally shooting Decedent. The evidence is also sufficient to convict Appellant of Solicitation of Murder because, with the requisite intent, Appellant requested that his co-defendants kill the eyewitness to the murder for which he was awaiting trial. As the evidence supports each element of the crimes, Appellant's claim fails.

**C.**

Finally, Appellant contends that the verdict is against the weight of the evidence. In reviewing a weight of the evidence claim, an appellate court does not directly assess the "underlying question of whether the verdict is against the weight of the evidence" but, rather, whether the trial court abused its discretion in deciding that issue. *Lake*, 281 A.3d at 346-47. "In order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the [trial] court." *Commonwealth v. Talbert*, 129 A.3d 536, 545-46 (Pa. Super. 2015) (citation and internal quotation marks omitted). We reiterate that "[t]he weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the

credibility of the witnesses." ***Commonwealth v. Miller***, 172 A.3d 632, 642 (Pa. Super. 2017) (citation omitted).

Appellant argues that the jury's verdicts of Murder and related crimes are against the weight of the evidence. Appellant's Br. at 17-20. He emphasizes that, while Floyd testified to his own activities and those of the other co-conspirators, Floyd acknowledged that he did not speak directly to Appellant regarding the murder. Appellant claims that the trial court abused its discretion in denying a new trial, alleging that "the trial court relies wholly on speculative interpretation of the prison tapes and the inadmissible testimony of Floyd in relation to Appellant." ***Id.*** at 20. This issue is meritless.

We conclude that the trial court did not abuse its discretion in rejecting this claim. The trial court explained that the verdict did not shock its conscience because the Commonwealth presented "compelling testimony and evidence supporting Appellant's guilt." Trial Ct. Op. at 42. The trial court highlighted the prison phone calls, from which the jury could "reasonably infer that [Appellant] was soliciting and conspiring to have the witness in his murder case killed before a preliminary hearing went forward[,]" and Floyd's testimony as corroborated by the surveillance video and cell phone records. ***Id.*** After careful review, we find that the record supports this determination and that Appellant's claim fails.

As Appellant fails to establish a right to relief on any of the issues presented, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/5/2024