J-A24029-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SEMAJ ARMSTEAD | : | |
| | : | |
| Appellant | : | No. 1269 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006315-2018

BEFORE: STABILE, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY DUBOW, J.: **FILED APRIL 5, 2024**

Appellant Semaj Armstead appeals from the judgment of sentence entered by the Philadelphia County Court of Common Pleas on March 29, 2022, after a jury convicted him of First-Degree Murder and Conspiracy to Commit Murder. Appellant challenges the sufficiency of the evidence and argues that the verdict was against the weight of the evidence. After careful review, we affirm the judgment of sentence.

In March 2022, a jury convicted Appellant, Michael Blackston, Chad Rannels, and Rashawn Combs of charges related to the December 2011 murder of Kevin Drinks ("Decedent"), whom they mistakenly believed was a

witness to a prior murder for which Rannels was awaiting trial.[1]  The relevant factual and procedural history is as follows.

In 2011, Philadelphia police arrested Rannels for the July 30, 2011 murder of Kristin Freeman.  While in prison awaiting his preliminary hearing, Rannels made fourteen recorded phone calls between September 27, 2011, and December 9, 2011, including several to Blackston and Appellant. Relevantly, during the calls Rannels provided an address and description of a person he believed was an eyewitness to the murder named John Fisher.  The calls also included discussion of Rannels' potential counsel.  Rannels repeatedly instructed the co-defendants to be on their "A-Game."  Trial Ct. Op., 2/23/23, at 2.

On December 10, 2011, four days prior to Rannels' scheduled preliminary hearing, Blackston, while standing on a corner with Appellant, Combs, and Eugene Floyd, saw Decedent drive by them in a white truck. Blackston said, "That is the guy right there." N.T., 3/23/22, at 15-16.  Floyd, to whom the Commonwealth granted immunity, testified at trial that he understood Appellant's statement to mean that the driver of the truck was the eyewitness to Mr. Freeman's murder.  *Id.*  It is undisputed that Decedent had

_____

[1] Appellants' co-defendants have also appealed their judgments of sentence. The dispositions in **Commonwealth v. Blackston**, 1367 EDA 2022, and **Commonwealth v. Rannels**, 1230 EDA 2022,  have been filed in conjunction with the instant case.  **Commonwealth v. Combs**, 3161 EDA 2022, which was submitted after the others, is pending before a different panel.

an "uncanny" resemblance to the eyewitness, Mr. Fisher, and that Mr. Fisher and Decedent both drove white trucks. N.T., 3/24/22, at 93.

The four men immediately entered vehicles and followed Decedent in his white truck. Floyd drove Blackston in a Chevrolet minivan while Combs drove Appellant a white PT Cruiser. The police eventually discovered that Appellant's sister owned the minivan and Blackston's girlfriend owned the PT Cruiser.

The co-conspirators followed Decedent for approximately six hours while Decedent made deliveries and while the co-conspirators "maintain[ed] constant communication with each other." Trial Ct. Op. at 4. At 6:17 pm., after receiving confirmation of the truck's location from Combs in the PT Cruiser, Floyd parked the minivan close to where Decedent had parked the white truck. Blackston then exited the minivan, ran to the white truck, and fatally shot Decedent. The co-conspirators then left the area and reconvened at the house of Appellant's sister. Police arrived at the murder scene minutes later and transported Decedent to the hospital where he was pronounced dead.

During the initial investigation, police recovered the surveillance videos from several cameras in the area around the murder, from which they identified the PT Cruiser as a vehicle of interest. Detectives, however, did not connect the co-conspirators to the crime until 2018. Ultimately, the Commonwealth charged Appellant and his three co-defendants with murder and related crimes.

In March 2022, the trial court presided over a joint jury trial of Appellant and his co-defendants. Floyd testified to the narrative set forth above. The jury also viewed a compilation video of the surveillance camera videos. As described by the trial court, the video depicted the PT Cruiser following a white box truck and then passing the truck as it parked at 5:48 p.m. The video also showed the PT Cruiser and the minivan circling the murder scene between 5:48 p.m. and 6:16 p.m., immediately before the 6:17 p.m. murder.

Detectives also testified regarding the cell phone records and historical cell site data for the co-conspirators' phones on the day of the murder. The records documented nearly 40 connections between Appellant and Floyd's phones between 3:37 p.m. and 6:19 p.m. on the day of the murder and revealed that Blackston's phone "went off the network" sometime after a nearly eight-minute phone call from Appellant's phone beginning at 3:03 p.m. Trial Ct. Op. at 17. Historical cell site analysis tracked Combs' and Appellant's phones traveling together along the path that Decedent took prior to the murder, in the area of the murder at the time of the murder, and driving to the Glenwood section of Philadelphia immediately after the murder. Finally, the jury heard the recordings of Rannels' prison phone calls, including those on which Appellant participated.

On March 29, 2022, the jury convicted Appellant of First-Degree Murder and Conspiracy to Commit Murder.[2] On the same day, the trial court

---

[2] 18 Pa.C.S. §§ 2502 and 903(c), respectively. The jury found Appellant not guilty of Possession of an Instrument of Crime.

sentenced Appellant to a mandatory minimum sentence of life imprisonment without the possibility of parole for Murder and a consecutive sentence of 10 to 20 years of imprisonment for Conspiracy to Commit Murder.

On April 7, 2022, following the appointment of appellate counsel, Appellant filed a post-sentence motion, claiming that the verdict was against the weight of the evidence. On the same day, the trial court denied the post-sentence motion. On May 6, 2022, appellate counsel filed a timely notice of appeal. The trial court and Appellant complied with Pa.R.A.P. 1925.

Appellant raises the following issues to this Court:

1. Is the evidence sufficient, as a matter of law, to convict appellant of the crimes of [F]irst[-]degree [M]urder and [C]onspiracy to [C]ommit [F]irst[-]degree Murder where the evidence of record does not establish beyond a reasonable doubt that [A]ppellant possessed a specific intent to kill the decedent?

2. Is the verdict of guilty against the weight of the evidence and so contrary to the evidence that it shocks one's sense of justice under the circumstances of this case?

Appellant's Br. at 7.

### A.

Appellant challenges the sufficiency of the evidence, which presents a question of law. *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). Accordingly, "our standard of review is *de novo*[,] and our scope of review is plenary." *Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013).

"When reviewing a challenge to the sufficiency of the evidence, we evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn

from the evidence." ***Commonwealth v. Lake***, 281 A.3d 341, 345 (Pa. Super. 2022), *appeal denied*, 291 A.3d 333 (Pa. 2023). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." ***Widmer***, 744 A.2d at 751. While guilt cannot be based only upon "suspicion or surmise[,]" a conviction based solely on "circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." ***Commonwealth v. Cline***, 177 A.3d 922, 925 (Pa. Super. 2017) (citation omitted).

Appellant challenges his convictions for First-Degree Murder and Conspiracy to Commit Murder. "To convict a defendant of first-degree murder, the jury must find that (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill." ***Commonwealth v. Montalvo***, 956 A.2d 926, 932 (Pa. 2008) (citing 18 Pa.C.S. § 2502(a)). "Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body." ***Commonwealth v. Padilla***, 80 A.3d 1238, 1244 (Pa. 2013). In cases such as this where a murder occurs but the defendant did not fire the fatal shots, a defendant can nonetheless be convicted of First-Degree Murder based upon conspiratorial liability where "the defendant personally harbored a specific intent to kill." ***Commonwealth v. Smyrnes***, 154 A.3d 741, 746 (Pa. 2017).

To establish sufficient evidence for Conspiracy, the Commonwealth must prove: "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another . . . to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Montalvo*, 956 A.2d at 932 (citation omitted); *see also* 18 Pa.C.S. § 903(a)(1). As a conspiratorial agreement is rarely formally documented, the Commonwealth may prove an agreement "inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators[.]" *Commonwealth v. Chambers*, 188 A.3d 400, 410 (Pa. 2018) (citation omitted).

Appellant asserts that the Commonwealth failed to present sufficient evidence to convict him of either First-Degree Murder or Conspiracy to Commit Murder because the evidence does not establish that he had a specific intent to kill, which is a required element of both crimes. Appellant's Br. at 35-50. In support, Appellant cites the prison phone call recordings which he emphasizes do include any express statements of Appellant's intent to kill. Instead, he contends that the exchanges in which Appellant explicitly agreed to be on his "A-Game" applied to securing defense counsel for Rannels and providing money to Rannels' girlfriend. *Id.* at 44. Appellant contrasts these exchanges with Rannels' calls solely to Blackston, during which Rannels provided the necessary witness identification information directly to Blackston

and Rannels and Blackston discussed their disappointment with Appellant and implied that Blackston "would handle it solo." Appellant's Br. at 36, 47-48.

Appellant also relies upon Floyd's testimony, in which Floyd claimed that he thought that they were "just follow[ing] the guy [to] see where he goes." N.T., 3/23/22, at 17. Appellant additionally highlights that Floyd asserted that he did not know that Blackston had a gun until they were together in the minivan. *Id.* at 22. Appellant, thus, argues that the Commonwealth did not present any evidence that Appellant was aware that Blackston had a gun in the minivan, given that he was riding in the PT Cruiser. Appellant further observes that the cell phone records did not include any direct communication between Appellant and Blackston after 3:03 p.m.

Thus, Appellant claims that the Commonwealth failed to show that Appellant was aware of or agreed to Blackston's plans to murder Decedent either during the prison phone calls or at any point during the day of the murder. Appellant, therefore, argues that this evidence is insufficient to establish that he had the requisite specific intent to kill. After careful review of the record, we disagree.

While we acknowledge that the evidence could be viewed to create the picture Appellant paints, our standard of review requires us to view the evidence in a light most favorable to the Commonwealth as verdict winner. With this standard of review, we agree with the trial court that the Commonwealth presented sufficient evidence of Appellant's specific intent to kill based upon the prison phone calls and his actions on the day of the murder.

We reject Appellant's reliance on Floyd's testimony that he thought the co-conspirators were merely following the truck and were unaware of Blackston's gun. As noted by the trial court, "a key distinction" exists between Floyd and Appellant: Appellant was a participant in the prison phone calls while Floyd was not. Trial Ct. Op. at 32.

The trial court set forth the following summary of the phone calls, which demonstrate Appellant's involvement in the conspiracy:

> In the first call, Rannels told Appellant and Blackston that he "needed" them on their "'A' game" and requested that Appellant "step up and take all the shit that I did." Appellant responded, "**Sure, [S]crap. We definitely ain't gon' let you down. For sure**." Rannels continued, saying he wasn't worried so long as his "team on the outside" was supporting him. Appellant again responded, "**Sure, we definitely got you Scrap. 'A' Game shit all the way.**"

Trial Ct. Op., 2/23/23, at 30-31 (emphasis added). In subsequent calls, Rannels indicated that he received "information about eyewitnesses from the Philadelphia Police Arrest Report, described the eyewitness to Blackston with the words 'glasses' and 'dark skin,' and provided him with an address. Rannels later confirmed these same details for Blackston and told him that he needed Blackston **and Appellant** 'on that shit.'" *Id.* at 31 (emphasis added).

On December 7, 2022, as his preliminary hearing date approached, Rannels expressed being "upset with **them**" because "**they** ain't takin care of business." Trial Ct. Op. at 13 (emphasis added). On a call that began late at night on December 8, 2011, Blackston reassured Rannels "**we** watching the motherfucker all day around this motherfucker." *Id.* at 14 (emphasis added).

Notably, Rannels and Blackston phrase their assertions using plural pronouns, indicating that the plan did not entail Blackston acting alone.

The fact that the calls do not include an express declaration of Appellant's specific intent to kill is not surprising or determinative, given that the participants knew the calls were recorded. In this context, we conclude that the calls provide sufficient evidence of Appellant's agreement to be on his A-Game to support Rannels, Rannels' plan to eliminate the eyewitness, and Rannels' and Blackston's expectation of multiple people, including Appellant, being involved in their plan rather than it involving Blackston's solo efforts.

Moreover, Appellant's actions on the day of the murder demonstrate his intent to further the conspiracy. We note that for six hours, Appellant engaged in pursuing the person whom they believed was the eyewitness to the murder for which Rannels was charged. During this time and until minutes after Blackston shot the Decedent, Appellant's phone had nearly forty contacts with Floyd's phone. Thus, we conclude that the evidence, while circumstantial, was sufficient for the jury to conclude beyond a reasonable doubt that Appellant possessed a specific intent to eliminate the person they believed was an eyewitness to the murder case against Rannels. Accordingly, Appellant's claim fails.

**B.**

Second, Appellant contends that the verdict is against the weight of the evidence. In reviewing a weight of the evidence claim, an appellate court does not directly assess the "underlying question of whether the verdict is

against the weight of the evidence" but, rather, whether the trial court abused its discretion in deciding that issue. *Lake*, 281 A.3d at 346-47. "In order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the [trial] court." *Commonwealth v. Talbert*, 129 A.3d 536, 545-46 (Pa. Super. 2015) (citation and internal quotation marks omitted). We reiterate that "[t]he weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Miller*, 172 A.3d 632, 642 (Pa. Super. 2017) (citation omitted).

Similar to his sufficiency claims, Appellant asserts that the verdict is against the weight of the evidence because any "evidence that [A]ppellant possessed a specific intent to kill . . . is substantially outweighed by the evidence to the contrary." Appellant's Br. at 52. Appellant contends that the evidence only supports his presence during the events of the day but does not demonstrate his awareness of or agreement with Blackston and Rannels' plan to murder the eyewitness. *Id.* at 52-55. We disagree.

The trial court, which had the benefit of observing the witnesses testify and listening to the prison phone call recordings, determined that the evidence against Appellant was not "tenuous, vague, and uncertain" but rather "compelling[.]" Trial Ct. Op. at 35. After reviewing the record, we conclude that the trial court did not abuse its discretion in concluding that the verdict did not shock its conscience. *Id.* Accordingly, this claims also fails.

- 11 -

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/5/2024